*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  11a0203p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CENTER FOR BIO-ETHICAL REFORM, INC.,
GREGG CUNNINGHAM, and KEVIN MURRAY,
          *Plaintiffs-Appellants,*

    *v.*

JANET NAPOLITANO, in her capacity as
Secretary of the Department of Homeland
Security, and ERIC H. HOLDER, JR., in his
capacity as Attorney General of the United
States,

          *Defendants-Appellees.*

No. 10-1439

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 09-11441—John Corbett O'Meara, District Judge.

Argued:  June 7, 2011

Decided and Filed:  August 4, 2011

Before:  COLE, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Robert Joseph Muise, THOMAS MOORE LAW CENTER, Ann Arbor, Michigan, for Appellants.  Chantale Fiebig, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees. **ON BRIEF:**  Robert Joseph Muise, THOMAS MOORE LAW CENTER, Ann Arbor, Michigan, for Appellants.  Steven P. Croley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellees.

1

———————————

**OPINION**

———————————

CLAY, Circuit Judge.    In this action arising under the First and Fifth Amendments to the U.S. Constitution, Plaintiffs Center for Bio-Ethical Reform, Inc., Gregg Cunningham, and Kevin Murray appeal the district court's dismissal of their claims against Defendant Janet Napolitano, in her capacity as Secretary of the Department of Homeland Security, and Defendant Eric H. Holder, Jr., in his capacity as Attorney General of the United States, for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set forth below, we **AFFIRM**.

**BACKGROUND**

Plaintiff Center for Bio-Ethical Reform, Inc. ("CBR") is a "pro-life, non-profit corporation" that "was established . . . to promote prenatal justice and the right to life for the unborn[.]" (R. 16; Amended Complaint ("Am. Compl.") ¶¶ 9, 71.)  CBR's "anti-abortion activities" are numerous.  (*Id.* ¶¶ 9, 71-75.)  The CBR Reproductive Choice Campaign "consists of [displaying] large, colorful [and] graphic images of first-term aborted fetuses" on trucks that are driven throughout the nation.  (*Id.* ¶ 72.)  The CBR Airborne Reproductive Choice Campaign consists of the same images but "displayed on banners towed behind aircraft" that are flown throughout the nation.  (*Id.* ¶ 73.)  The CBR Genocide Awareness Project consists of a "traveling photo-mural exhibit" that compares abortion to the Holocaust.  (*Id.* ¶ 74.)  Finally, the CBR Obama Awareness Campaign utilizes trucks and aerial banners to "juxtapose[] images and quotations of President [Barack] Obama alongside aborted fetuses and aborted preborn children." (*Id.* ¶ 75.)

Plaintiff Gregg Cunningham is CBR's executive director, and Plaintiff Kevin Murray is a private individual and former U.S. Marine.  (*Id.* ¶¶ 10-11.)  Defendants are

Janet Napolitano, Secretary of the U.S. Department of Homeland Security ("DHS"), and Eric H. Holder, Jr., Attorney General of the United States.  (*Id.* ¶¶ 12-13.)

According to the Amended Complaint, this is an action "challenging the policy, practice, procedure, and/or custom of Defendants that targets for disfavored treatment those individuals and groups that Defendants deem to be 'rightwing extremists' (hereinafter RWE Policy)."  (*Id.* ¶ 1.)  Plaintiffs characterize this "policy, practice, procedure, and/or custom" as constituting a "Rightwing  Extremist Policy" or "RWE Policy."  (*Id.*)  Plaintiffs do not define the RWE Policy with any precision or specificity, but allege that the "RWE Policy was created, adopted, implemented, and enforced through a partnership with private organizations that are political adversaries of Plaintiffs," including the Anti-Defamation League, Southern Poverty Law Center, and the National Abortion Federation.  (*Id.* ¶¶ 2, 55-56.)

Plaintiffs allege that the "RWE Policy was recently and publicly confirmed by the Department of Homeland Security in an assessment entitled, 'Rightwing Extremism: Current Economic and Political Climate Fueling Resurgence in Radicalization and Recruitment,'" or "DHS Assessment."  (*Id.* ¶ 3.)  The DHS Assessment, which is not attached to the Complaint or Amended Complaint, or otherwise contained in the record, is alleged to be "part of the RWE Policy."  (*Id.* ¶ 15.)

Plaintiffs allege that they have been harmed by Defendants' "policy of targeting certain individuals and groups, including Plaintiffs, for disfavored treatment based on their viewpoint on controversial political issues[.]"  (*Id.* ¶ 4.)  Plaintiffs claim further harm on account of the "partnership that was forged between Defendants and certain private organizations to create, adopt, implement, and enforce the RWE Policy."  (*Id.*)

On April 16, 2009, Plaintiffs commenced this action in the district court, and on June 9, 2009, filed an Amended Complaint against Defendants, asserting claims under the First and Fifth Amendments of the U.S. Constitution.  Specifically, the Amended Complaint contains three claims:  (1) "First Amendment – Freedom of Speech;"

(2) "First Amendment – Expressive Association;" and (3) "Fifth Amendment – Equal

Protection." (*Id*. ¶¶ 113-21.)

Based on these alleged constitutional violations, the Amended Complaint seeks

a declaration:

> that [(1)] through the creation, adoption, implementation, and enforcement of the RWE Policy, Defendants have violated Plaintiffs' [] constitutional rights[; (2)] the RWE Policy infringes upon the right to engage in controversial political speech[ and] upon [] freedom of expressive association in violation of the First Amendment . . . ; [and (3)] the RWE Policy violates . . . the Fifth Amendment by targeting certain individuals and groups for disfavored treatment based on the viewpoint of their speech.

(*Id.* ¶ 5.) The Amended Complaint also seeks, in addition to attorneys' fees, an order:

> [(1)] enjoining the RWE Policy and its application to Plaintiffs' speech and activities; [(2)] directing the disclosure of any files or databases containing information about Plaintiffs or Plaintiffs' activities[; (3)] enjoining the creation or maintenance of files or databases containing information about Plaintiffs or Plaintiffs' activities[; and (4)] enjoining the disclosure of information or data about Plaintiffs or Plaintiffs' activities to private organizations.

(*Id.*)

On September 11, 2009, Defendants moved to dismiss the Amended Complaint

for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure. After the motion was fully briefed, the district

court, on March 30, 2010, granted the motion and accordingly entered judgment for

Defendants. The district court explained that

> Plaintiffs fail to address affirmative conduct undertaken by the defendants. They fail to allege any time, place, or manner restrictions that Defendants have imposed on their speech. They fail to allege that Defendants taxed or punished their First Amendment activities. They fail to allege that Defendants imposed any prior restraint on their protected speech. They fail to allege any form of retaliation by Defendants for their exercise of protected speech on identified occasions.

*Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, No. 09-11441, 2010 WL 1257361, at *3 (E.D. Mich. Mar. 30, 2010). Plaintiffs then filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

Based on our review of the allegations contained in the Amended Complaint, we conclude that Plaintiffs have failed to state a claim against Defendants under either the First or Fifth Amendments to the U.S. Constitution. As explained in detail below, the Amended Complaint contains numerous irrelevant allegations, and those that are relevant fail to plausibly allege that Defendants have violated Plaintiffs' constitutional rights. For this reason, we **AFFIRM** the dismissal of this action.

## I.     Standard of Review

The sufficiency of a complaint is a question of law, and we therefore review *de novo* the district court's dismissal of the Amended Complaint for failure to state a claim. *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 664 (6th Cir. 2005). Our task is to "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951 (2009).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although the complaint need not contain "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), Rule 8(a)(2) of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949. As the Supreme Court explained in *Iqbal*: "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks, citations, and alterations omitted).

Following *Twombly* and *Iqbal*, it is well settled that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on its face if the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). Plausibility is not the same as probability, but rather "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (stating that factual allegations "merely consistent with liability stop[] short of the line between possibility and plausibility").

In reviewing the dismissal of the Amended Complaint, we are guided by the following "working principles." *Id.* First, the general rule that the court must accept as true all allegations in the complaint "is inapplicable to legal conclusions." *Id.* This means that conclusory recitals of the elements of a claim, including legal conclusions couched as factual allegations, "do not suffice." *Id.* at 1949-50 ("[Rule 8] does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950. Plausibility is a context-specific inquiry, and the allegations in the complaint must "permit the court to infer more than the mere possibility of misconduct," namely, that the pleader has "show[n]" entitlement to relief. *Id.* (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

## II.    Nature of the Claims in the Amended Complaint

At the outset, we note that our review is complicated by Plaintiffs' failure to properly define the issues to be decided, or the nature of their claims. Plaintiffs' appellate brief contains more rhetoric than structured legal analysis; indeed, Plaintiffs rely primarily on a recitation of the policies underling the First and Fifth Amendments, and an amalgamation of case citations, without reference to the standard underlying constitutional liability. Plaintiffs' brief discusses various alleged violations of "fundamental rights" in a confused manner, without any reference to the elements of

their claims, or a meaningful recognition of the analytical interplay between the First and Fifth Amendments. And while Plaintiffs characterize their claims as being asserted against Defendants in their "official capacities," many of the allegations in the Amended Complaint appear to raise *Bivens*-type claims that may be asserted against federal officials only in their individual capacities. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (holding that a plaintiff may bring an action against a federal official for a violation of constitutional rights).

Based on our review of the Amended Complaint, it appears that Plaintiffs, in substance, seek to assert a First Amendment retaliation claim, and a Fifth Amendment equal protection claim, against Defendants in both their individual and official capacities. Recognizing that this action was dismissed in its infancy, we will construe the Amended Complaint broadly as alleging such claims. We will construe the official capacity claims as an as-applied challenge to the existence and enforcement of the claimed RWE Policy, and the individual capacity claims as seeking equitable relief under *Bivens*. Our analysis applies equally to both types of claims.

## III.    Application

As explained below, Plaintiffs have failed to plausibly allege the existence of the RWE Policy—dooming their official capacity claims—and have failed to plausibly allege any constitutional violation by Defendants—dooming their individual capacity claims. Our analysis proceeds in three parts. First, we identify and disregard those allegations in the Amended Complaint that are wholly irrelevant to Plaintiffs' constitutional claims. Second, we consider whether Plaintiffs have stated a claim under the First Amendment. Finally, we consider whether Plaintiffs have stated a claim under the Fifth Amendment.

### A.          Irrelevant Allegations

The 25-page Amended Complaint contains numerous allegations, and an exhibit, that are wholly irrelevant to Plaintiffs' constitutional claims.  Prior to considering questions of plausibility, we briefly note, and disregard, these irrelevant portions of the Amended Complaint, so that we may focus our judicial inquiry on the precise issues to be decided.  *See Kermanj v. Goldstein*, 401 F. App'x 458, 460 (11th Cir. 2010) (stating that the "irrelevant statements" in the complaint "made it impossible to separate out the factual allegations supporting" the claims).  *Cf. Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1002 (6th Cir. 2009) (disregarding irrelevant assertions by the parties in considering the validity of an arbitration clause).

The irrelevant allegations in the Amended Complaint that we disregard include statements seeking to vindicate the rights of non-party interest groups (Am. Compl. ¶¶ 33, 47, 77-80), and non-party individuals, including an unidentified "Christian man" in Oklahoma who was stopped at an unidentified time by an unidentified "local law enforcement officer for having a sign displayed in his vehicle that read, 'Abort Obama Not the Unborn,'" and who was subsequently "investigated" by unnamed individuals and/or agencies of the "federal government." (*Id.* ¶ 34.) Other irrelevant allegations in the Amended Complaint that we disregard include statements relating to the U.S. Congress (*id.* ¶¶ 54 (committee report), 64 (proposed legislation)); harassment by the Internal Revenue Service and the Federal Aviation Administration (*id.* ¶¶ 83-84), neither of which are parties to this litigation; Defendants' views on the Second Amendment (*id.* ¶ 45 ("Defendants do not consider a private citizen's right to bear arms to be an individual right")); the allocation of resources within the "federal government" (*id.* ¶¶ 27, 30 (referencing anonymous statement of a "current FBI agent" that the intelligence community has shifted resources to target "those who used to be patriots")); the actions of non-federal law enforcement agencies (*id.* ¶ 50 (referencing "state, local, tribal, and private organizations")); and the nature of Plaintiff Murray's unrelated lawsuit against the Secretary of the Treasury that sought to "enjoin the unconstitutional

distribution to, and use of federal taxpayer funds by, American International Group, Inc. (AIG)." (*Id.* ¶ 98.)

Additionally, we disregard the exhibit to the Amended Complaint that is neither referenced in the Amended Complaint, nor in any way relevant to the sufficiency of the Amended Complaint. (*Id.*, Ex. A.) Exhibit A of the Amended Complaint consists of four pages of graphic images of aborted fetuses apparently used by CBR as part of the Obama Awareness Campaign. These images of aborted fetuses, which are placed atop U.S. currency,[1] have no bearing on the issues to be decided. Plaintiffs do not argue to the contrary on appeal.

We now turn to Plaintiffs' constitutional claims, and consider whether, based upon the remaining allegations in the Amended Complaint, Plaintiffs can show their entitlement to relief.

### B.      First Amendment Claim

We begin with Plaintiffs' First Amendment claim, which we evaluate under the framework set forth by the Supreme Court in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977). *See Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007). Under *Mount Healthy* and its progeny, a plaintiff must show that (1) the plaintiff was participating in a constitutionally protected activity; (2) the defendant's action injured the plaintiff in a way likely to deter a person of ordinary firmness from further participation in that activity; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct. *See, e.g.*, *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998) (internal citations omitted).

---

[1] We do not address whether these depictions may give rise to criminal liability for the defacement of U.S. currency, in violation of 18 U.S.C. §§ 331 and 333.

Once a plaintiff raises an inference that the defendant's conduct was motivated in part by the plaintiff's protected activity, the burden shifts to the defendant to "demonstrate that it would have taken the same action in the absence of the protected activity." *Arnett v. Myers*, 281 F.3d 552, 560-61 (6th Cir. 2002) (citing *Thaddeus-X*, 175 F.3d at 399). The inquiry of "whether activity is 'protected' or an action is 'adverse'" is context-specific. *Thaddeus-X*, 175 F.3d at 388. We now consider each element in detail.

### 1.     Whether Plaintiffs were participating in constitutionally protected activity

The First Amendment generally protects controversial speech. "The fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *Hill v. Colorado*, 530 U.S. 703, 714-15 (2000); *see also Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects. . . . That is why freedom of speech, though not absolute, . . . is nevertheless protected against censorship or punishment.").

In this case, Defendants do not challenge Plaintiffs' participation in constitutionally protected activity, and we will assume, for purposes of this appeal, that this element is satisfied and accordingly focus on the remaining two elements. *See Fritz*, 592 F.3d at 723 (conduct was protected by the First Amendment, for purposes of a motion for judgment on the pleadings, where the defendants did not argue otherwise).

### 2.     Whether Defendants' action injured Plaintiffs in a way likely to deter a person of ordinary firmness from further participation in constitutionally protected activity

The second element of a First Amendment retaliation claim requires an "adverse action" by the defendant that "would deter a person of ordinary firmness from continuing to engage in the kinds of protected conduct in which [the plaintiff] was engaging." *Id.* (internal quotation marks and citations omitted). Adverse actions that may deter a person of ordinary firmness from exercising protected conduct may include "harassment

or publicizing facts damaging to a person's reputation." *Id.* at 724 (citing *Thaddeus-X*, 175 F.3d at 396). Although much of our First Amendment retaliation jurisprudence addresses claims by public employees and prisoners, the same legal framework applies where, as here, private parties challenge governmental action. *Id.* at 725.

As applied to this case, the operative question is whether Plaintiffs have adequately pleaded that Defendants' actions would be sufficient to deter a citizen of ordinary firmness from participating in meetings or otherwise criticizing federal officials about matters relevant to Plaintiffs' political views. *Id.* On appeal, Plaintiffs group their allegations of Defendants' alleged unconstitutional actions, taken pursuant to the RWE Policy, into three categories: first, "officially designating political opponents as dangerous 'rightwing extremists,'" (Pls.' Br. at 32); second, "conducting intrusive and coercive investigations and surveillance to dissuade political opposition," (*id.*); and third, "sharing official files and records with political opponents." (*Id.* at 36.)

Consistent with *Iqbal*, "[w]e begin our analysis by identifying the [relevant] allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 129 S. Ct. at 1951. In this case, those allegations are numerous.

Most significantly, Plaintiffs have failed to plausibly allege the existence of the claimed RWE policy pursuant to which they allege constitutional violations. Indeed, it is altogether unclear what constitutes the RWE Policy in light of Plaintiffs' vague and conclusory allegations and arguments on appeal. As best we can tell, the policy is alleged to be an Orwellian monster that consists of some amorphous combination of a "policy, practice, procedure, and/or custom of Defendants." (Am. Compl. ¶ 1; *see also* Pls.' Br. at 38 (arguing that the RWE Policy "takes us a step closer to 1984").) The Amended Complaint identifies no document, policy directive, or anything else that would constitute the RWE Policy.[2] As explored below, even if we assume *arguendo* the

---

[2]We note Plaintiffs' allegation that the DHS Assessment is "part of the RWE Policy." But the DHS Assessment is not contained in the record, nor do Plaintiffs explain how the DHS Assessment supports their claim. The DHS Assessment is publicly available on the internet (*see, e.g.*, http://www.fas.org/irp/eprint/rightwing.pdf), and we could perhaps take judicial notice of this document, but there is no need for us to do so. Instead we note, as an observation unrelated to our disposition of this

existence of the RWE Policy, Plaintiffs have failed to show that any actions taken pursuant to the RWE Policy would entitle them to relief.

The Amended Complaint alleges that "[a]ccording to the RWE Policy, Plaintiffs are 'rightwing extremists.'" (Am. Compl. ¶ 20.)  Without any plausible statements as to when, where, in what, or by whom such a designation was made, this allegation amounts to a "naked assertion[] devoid of further factual enhancement" that is not entitled to a presumption of truth.[3] *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks, citations, and alterations omitted).  *Cf. Meese v. Keene*, 481 U.S. 465 (1987) (considering a First Amendment challenge to the federal government's official labeling of a movie as "political propaganda" pursuant to a statute authorizing such a designation).

Next, the Amended Complaint makes numerous conclusory and bare allegations about law enforcement activities, including surveillance, that have been directed towards Plaintiffs.  (*See, e.g.*, Am. Compl. ¶ 31 ("covert surveillance"); *id.* ("collect data"); *id.* ¶ 32 ("targeting anti-abortion organizations as potential domestic terrorists"); *id.* ¶ 33 ("emerging patter [sic] of abuse"); *id.* ¶ 35 ("conducting surveillance"); *id.* ("taking law enforcement actions"); *id.* ¶ 36 ("conducting surveillance on public events, such as the national TEA parties[4] and anti-abortion protests and demonstrations"); *id.* ¶ 37 ("target of federal and local law enforcement actions"); *id.* ¶¶ 46-48 ("increasing government surveillance and scrutiny"); *id.* ¶ 51 ("encourag[ing] the reporting of information

---

matter, that the document makes no reference to any of the named plaintiffs in this case, and simply states, in a footnote, that rightwing extremism "may" be found within certain "groups and individuals that are dedicated to a single issue, such as opposition to abortion or immigration."

[3] Further casting doubt on the plausibility of this allegation, elsewhere in the Amended Complaint Plaintiffs seem to suggest that Defendants never labeled Plaintiffs as "rightwing extremists," but rather the label has been "broadly applied and construed" by unspecified parties "to include Plaintiffs and those that associate with them."  (Am. Compl. ¶ 19.)  Indeed, many of the allegations about the labeling of Plaintiffs are pleaded in the passive voice.  (*See id*. ¶¶ 17-18 ("those deemed to be 'rightwing extremists"); *id.* ¶ 18 (same); *id.* ¶ 31 ("individuals and groups declared to be 'rightwing extremists'"); *id.* ¶ 35 ("deemed to be 'rightwing extremists'"); *id.* ¶¶ 46-47, 50, 57 (same)); *see also Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 (11th Cir. 2002) (noting that excessive use of the passive voice in pleadings leads to "unnecessary confusion and obfuscation").

[4] The Amended Complaint describes "TEA parties" as "peaceful public protests to the expansion of the federal government and federal spending programs under the current administration and the increase in taxes that will be required to fund them."  (Am. Compl. ¶ 22.)

concerning 'suspicious' or 'criminal' activity of 'rightwing extremists'"); *id.* ¶ 69 (collecting "personal information"); *id.* ¶ 76 ("greater target for law enforcement action" as a result of the "Obama Awareness Campaign"); *id.* ¶ 81 ("target of surveillance and enforcement actions"); *id.* ¶ 85 ("increased government scrutiny, investigation, surveillance, and intimidation"); *id.* ¶ 95 (law enforcement "slow to investigate threats to CBR"); *id.* ¶¶ 99, 106 ("government scrutiny, investigation, surveillance, and intimidation"); *id.* ¶ 105 ("DHS-sanctioned . . . harass[ment]").)

None of these bare allegations provide the factual context that would render them plausible and thus entitle them to a presumption of truth at this stage in the litigation. *See Iqbal*, 129 S. Ct. at 1950; *Nagim v. Napolitano*, No. 10-CV-00329, 2011 WL 841285, at *1-2 (D. Colo. Mar. 8, 2011) (dismissing similar challenge to claimed "rightwing extremist policy"). Unlike *Fritz v. Charter Township of Comstock*, where the plaintiff alleged three specific retaliatory phone calls to her employer, Plaintiffs in this case rely on vague and undated assertions of law enforcement activities directed at them. *See Fritz*, 592 F.3d at 723. The Amended Complaint is silent about the location, manner, duration, extent or timing of the alleged government harassment, surveillance, and scrutiny. *Cf. Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir. 2010) (finding allegations sufficient, where complaint stated prison officials confiscated and destroyed prisoner's outgoing mail on two specific dates); *Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 821 (prior litigation by CBR, alleging specific unlawful actions on a specific date and time).

With regard to information sharing, the Amended Complaint similarly offers conclusory and bare allegations, which are consequently not well-pleaded, and "disentitle[d] . . . to the presumption of truth." *Iqbal*, 129 S. Ct. at 1951. (*See, e.g.*, Am. Compl. ¶ 50 ("share information"); *id.* ¶ 52 (information is gathered, and then "it is shared with certain private organizations that are political adversaries of Plaintiffs"); *id.* ¶ 57 ("no safeguards for the use or distribution of the information collected pursuant to the policy"); *id.* ¶ 69 (information "is shared with private organizations . . . such as SPLC, NAF, and ADL"); *id.* ¶ 70 ("sharing of information"); *id.* ¶ 109 ("improper

sharing of private information and data").)   Plaintiffs do not describe the type of information that "is shared," who shared this information, or why any claimed "sharing" would operate to chill their First Amendment rights.   The allegations in the Amended Complaint amount to nothing more than the type of "unadorned, the defendant-unlawfully-harmed-me" accusations that *Iqbal* deemed insufficient.   *See Iqbal,* 129 S. Ct. at 1949.   Plaintiffs do not even explain how the alleged information sharing has resulted in any concrete harm.   *See Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 (6th Cir. 1983) (holding that the plaintiffs' "subjective fear" about misuse of information collected pursuant to a law enforcement operation "is insufficient to establish a First Amendment claim").

Finally, the Amended Complaint makes numerous conclusory and bare allegations that Defendants' actions have had the effect of chilling Plaintiffs' speech. (*See, e.g.*, Am. Compl. ¶¶ 88-89, 108 ("negatively affected CBR's reputation, thereby making it difficult to recruit volunteers, to raise money, and to obtain permission to engage in speech activity at public locations, such as college and university campuses"); *id.* ¶¶ 91, 108 ("negatively affected CBR's ability to raise money through donations to support its anti-abortion speech activities"); *id.* ¶ 92 ("negatively affected CBR's present effort to forge working relationships with mega-churches, which do not want to be associated with 'extremist' groups of any sort"); *id.* ¶¶ 100-04 ("Plaintiff Murray is deterred from attending, participating in, or associating with those who participate in TEA parties . . . [and] those who engage in anti-abortion protests and activities . . . for fear that he would be denied employment" in the federal government on account of his expressive activities); *id.* ¶ 105 ("deterrent effect on political speech and expressive association"); *id.* ¶ 106 ("deterrent effect on . . . activities and . . . rights to freedom of speech and expressive association").)   These allegations are not well-pleaded, and their conclusory nature "disentitles them to the presumption of truth." *Iqbal*, 129 S. Ct. at 1951.

Having set aside the conclusory and unadorned allegations that are not entitled to a presumption of truth as well-pleaded allegations, we "consider the [remaining]

factual allegations . . . to determine if they plausibly suggest an entitlement to relief." *Id.* To be sure, the Amended Complaint does contain certain allegations that are relatively more specific, but none of them give the Amended Complaint the ring of plausibility as to the second element of a First Amendment retaliation claim. We consider the remaining allegations in turn.

First, in Paragraphs 28 and 29, the Amended Complaint alleges:

¶ 28.  Pursuant to the RWE Policy, on or about March 23, 2009, a confidential directive was issued by FBI headquarters in Washington, D.C. to each of its 56 field offices, instructing the Special Agent in Charge (SAC) to verify the date, time, and location of each TEA party within his or her region and to supply that information to FBI headquarters.  The directive instructed the field office to obtain and confirm the identity of the individual(s) involved in the actual planning and coordination of the event in its region.  The directive was tightly controlled.

¶ 29.  Pursuant to the RWE Policy, a second directive was issued by FBI headquarters on or about April 6, 2009.  This directive instructed each SAC to coordinate and conduct, either at the field office level and/or with the appropriate resident agency, covert video surveillance and data collection of the participants of the TEA parties. This information was to be submitted to Washington, D.C.

These allegations describe Defendants' actions on certain dates—March 23, 2009 and April 6, 2009—but fail to adequately plead that the actions of Defendants were likely to deter a person of ordinary firmness from further participation in expressive activities.  The allegations refer to "confidential" directives that were "tightly controlled," making it implausible that Plaintiffs, or others, were aware of these directives, in the absence of any allegation that the directives were publicly disclosed. The "mere presence of an intelligence data-gathering activity" does not give rise to constitutional liability. *Gordon*, 706 F.2d at 781. Without additional allegations with regard to these "directives," their mere existence is insufficient to state a claim.

Second, perhaps related to the above-allegations, the Amended Complaint alleges in Paragraphs 22 and 24:

¶¶ 22, 24.   The DHS Assessment was "leaked" to the public approximately one week prior to the TEA (Taxed Enough Already) parties that were scheduled to be held across the country on April 15, 2009. . . . The public release of the DHS Assessment had the intended and calculated effect of deterring people, such as Plaintiffs and those who associate with them, from participating in events such as the national TEA parties and anti-abortion protests and demonstrations.

Although perhaps more than a bare conclusion, this allegation is insufficient to plead that Defendants' action injured Plaintiffs in a way likely to deter a person of ordinary firmness from further participation in constitutionally protected activity.  Plaintiffs allege only that the DHS Assessment "was leaked," but make no allegation as to who or what leaked the document, or whether that person or entity was affiliated with Defendants, or how and to what degree the information was disseminated.  Moreover, Plaintiffs fail to explain why the release of the DHS Assessment would deter them from attending "TEA parties," or any specific TEA party event that they, or anyone else, would have otherwise attended.

Third, regarding President Obama's commencement speech at the University of Notre Dame in 2009, the Amended Complaint alleges in Paragraphs 77, 79, and 80:

¶ 77.   According to sources within FEMA . . . a number of violent "right-wing," anti-abortion individuals and groups arrived in South Bend, Indiana in May 2009 to protest President Obama's participation in the commencement ceremony at the University of Notre Dame.

¶¶ 79-80.  CBR was one of the "right-wing" groups that arrived in South Bend, and it deployed its "Obama Awareness Campaign" to protest the [P]resident and his policies on abortion.  Although there were no reported acts of violence committed during the ceremony, the anti-abortion groups that participated in the protest, such as CBR, were publicly described by federal officials as "right-wing" and "violent."

But the Amended Complaint does not allege any action by Defendants—it merely refers to "federal officials," who might work for myriad federal agencies unconnected to Defendants.  Moreover, the Amended Complaint refers only to one action of these "federal officials," namely "publicly describ[ing]" anti-abortion groups protesting at the

commencement as "right-wing" and "violent." The Amended Complaint does not state when, or by what means, such a "public" pronouncement was made, nor does the Amended Complaint allege the identity or activities of the other "anti-abortion groups that participated in the protest," rendering it impossible to evaluate the plausibility of the allegation that any public pronouncement had or was likely to have had an adverse effect on protected speech. *See Brown v. Matauszak*, No. 09-2259, 2011 WL 285251, at *5-6 (6th Cir. Jan. 31, 2011) (dismissing complaint for failure to state a claim, where prisoner alleged that prisoner officials improperly withheld court documents sent to him, but failed to plead facts about the nature of the withheld documents).

Fourth, the Amended Complaint alleges in Paragraph 81:

¶ 81. CBR and its employees and volunteers have been detained by agents from the FBI, who described CBR as a domestic terrorist organization on account of CBR's opposition to abortion. The Department of Justice defended the actions of the FBI, claiming that the FBI agents reasonably believed that CBR was involved in domestic terrorism.

This allegation is likewise deficient. The Amended Complaint does not identity, for example, who the FBI has detained, when or for how long the FBI did so, whether any charges were filed, and what the circumstances were surrounding the detentions, including whether a proper law enforcement purpose was served. The Amended Complaint also does not allege that any of the individual detentions were connected to CBR or the individual Plaintiffs in this case. In fact, the Amended Complaint appears to allege that CBR, a corporate entity, was somehow itself detained by the FBI, but provides no further elaboration. The Amended Complaint makes no allegation, aside from conclusory statements made throughout, that these arrests had the effect of chilling their speech, or would reasonably be expected to do so.

Fifth, with regard to Plaintiff Murray, the Amended Complaint alleges in Paragraph 103:

¶ 103 . . . . To date, Plaintiff has been denied employment with the U.S. Border Patrol and with the U.S. Immigration and Customs Enforcement.

But the Amended Complaint makes no allegation that these agencies denied federal employment to Plaintiff Murray on account of his expressive associations or activities, or pursuant to any alleged unconstitutional policy, or that Plaintiff Murray was otherwise qualified for these positions that he claims to have sought. In fact, the Amended Complaint contains no allegation that Plaintiff Murray is in any way connected to CBR.

Accordingly, based on a review of the allegations in the Amended Complaint, we conclude that Plaintiffs have failed to adequately plead that any of Defendants' actions injured Plaintiffs in any way that would deter a person of ordinary firmness from further participation in constitutionally protected activity.

### 3. Whether any adverse action by Defendants was motivated at least in part by Plaintiffs' constitutionally protected activity

Alternatively, even if Plaintiffs could satisfy the second element of a First Amendment retaliation claim, we conclude that Plaintiffs have failed to adequately plead the third element, namely that any adverse action by Defendants was motivated at least in part by Plaintiffs' constitutionally protected activity.

Plaintiffs present nothing more than unadorned allegations concerning Defendants' intent and motivation. (*See, e.g.*, Am. Compl. ¶ 40 ("Defendants seek to officially censor, correct, and/or condemn certain political views and ideas and thereby prescribe what shall be orthodox in politics, nationalism, religion, and other matters of opinion"); *id.* ¶ 41 ("The RWE Policy is designed to deter, prevent, and preempt activities that government officials deem to be in opposition to . . . the current administration"); *id.* ("Defendants seek to influence domestic public opinion in support of . . . the current administration"); *id.* ¶ 42 ("tool of intimidation" to "stifle political opinion and opposition"); *id.* ¶ 44 ("deter 'rightwing extremist' speech activities"); *id.* ¶¶ 51-52 ("in order to deter"); *id.* ¶ 105 ("silence political opposition" "marginalize political opponents"; "deter and diminish political opponents"); *id.* ¶ 107 ("designed to

marginalize them and their opposition to the policies and practices of the federal government").)

These vague and conclusory allegations of nefarious intent and motivation by officials at the highest levels of the federal government are not well-pleaded, and are therefore insufficient to "plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) ("The bald allegation of impermissible motive . . . , standing alone, is conclusory and is therefore not entitled to an assumption of truth.").

In *Iqbal*, the plaintiff alleged that high ranking federal officials had adopted a policy of unconstitutional detention based on race, religion and/or national origin. In declining to credit as true the plaintiff's allegations of intent, the Supreme Court held that "conclusory" allegations of intent "without reference to [] factual context" are deficient. *See Iqbal*, 129 S. Ct. at 1954. In this case, similar to *Iqbal*, nothing in the Amended Complaint states a plausible claim that Defendants personally, or through their respective departments, took any actions on account of Plaintiffs' constitutionally protected activities, or that any policy was adopted or enforced on an improper basis. Nothing in the alleged conduct of relevant federal law enforcement officers plausibly suggests that they were motivated by anything other than a proper law enforcement motive.

Indeed, the Amended Complaint makes no plausible allegation that the relevant actions of law enforcement were not supported by probable cause, or otherwise taken pursuant to a valid law enforcement purpose. *See Gordon*, 706 F.2d at 781 n.3 ("Courts have recognized that [government activity] in connection with a good faith law enforcement investigation does not violate First Amendment rights, even though it may be directed at communicative or associative activities."); *see also Leonard v. Robinson*, 477 F.3d 347, 355-36 (6th Cir. 2007) ("Probable cause is clearly relevant to [] First Amendment retaliation claims."). *Cf. Ctr. for Bio-Ethical Reform, Inc.*, 477 F.3d at 822-24 (holding that a three-hour detention without probable cause would suggest improper

motive where, during the detention, the officers knew of and discussed the political activity of plaintiffs).

The Ninth Circuit confronted a similar claim in *Moss v. U.S. Secret Service*, where protestors who were removed by the U.S. Secret Service claimed that the agency had a policy of removing protestors who were critical of President George W. Bush in violation of the First Amendment. 572 F.3d at 962. The Ninth Circuit rejected the claim on a motion to dismiss, reasoning:

> The allegation of systematic viewpoint discrimination at the highest levels of the Secret Service, without any factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed inadequate, and thus does nothing to enhance the plausibility of Plaintiffs' viewpoint discrimination claim against the Agents.

*Id.* at 970. Likewise in this case, and for the reasons discussed herein, the Amended Complaint fails to adequately plead that any adverse actions by Defendants were motivated by a desire to discriminate or retaliate against Plaintiffs on account of their constitutionally protected expressive activities. *See Iqbal*, 129 S. Ct. at 1950-51 (stating that the plaintiff has not "nudged his claims of invidious discrimination across the line from conceivable to plausible") (internal quotation marks, citations, and alterations omitted).

Accordingly, Plaintiffs have failed to adequately plead that any adverse action by Defendants was motivated at least in part by Plaintiffs' constitutionally protected activity.

### 4.      Summary

Plaintiffs have failed to state a claim against Defendants, in either their official or individual capacities, under the First Amendment. To the extent Plaintiffs seek to challenge the constitutionality of the alleged RWE Policy, Plaintiffs have failed to plausibly allege the existence of such a policy. And to the extent Plaintiffs seek to challenge the alleged retaliation by Defendants on account of Plaintiffs' protected

activities, Plaintiffs' allegations are likewise deficient. Plaintiffs have failed to plausibly allege that any actions by Defendants injured Plaintiffs in a way that would deter a person of ordinary firmness from further participation in constitutionally protected activity. Nor have Plaintiffs plausibly alleged that any adverse action by Defendants was motivated at least in part by Plaintiffs' constitutionally protected activity.

## C.      Equal Protection Claim

We now turn to Plaintiffs' Fifth Amendment claim, alleging that Defendants violated Plaintiffs' right to equal protection "by targeting Plaintiffs for disfavored treatment on account of Plaintiffs' viewpoint on certain political issues." (Am. Compl. ¶ 120.) The Fifth Amendment, of course, does not itself contain a guarantee of equal protection, but instead incorporates, as against the federal government, the Equal Protection Clause of the Fourteenth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 500 (1954). We evaluate equal protection claims against the federal government under the Fifth Amendment just as we would evaluate equal protection claims against state and local governments under the Fourteenth Amendment. *See United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004) (citing *Buckley v. Valeo*, 424 U.S. 1, 93 (1976)).

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006). As we have held, the "threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

In this case, the Amended Complaint fails to make a plausible allegation that similarly situated organizations and individuals, of a different political viewpoint, have not been subject to the same alleged treatment by Defendants. *See Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009) (allegation of discriminatory intent based on race must be "accompanied by some evidence that the people not disciplined were similarly situated and of a different race"). The allegations contained in the Amended Complaint as to disparate treatment amount to conclusory and unadorned assertions that, consequently, are not well-pleaded, and not entitled to a presumption of truth at this stage in the litigation. (*See, e.g.*, Am. Compl. ¶¶ 1-5, 120 (conclusory averment of "disfavored treatment").)

Plaintiffs fail to make any comparison to similarly situated groups, and, read broadly, the Amended Complaint alleges injury to nearly all Americans. (*Id.* ¶ 27 (referencing statement of an anonymous FBI agent that "true patriotic citizens of this country are on the Titanic"); *id.* ¶ 33 ("[T]here is an emerging pattern of systematic abuse of state and federal law enforcement and intelligence assets to target law-abiding Americans engaged in the peaceful expression of political views.").)

Accordingly, in the absence of any plausible allegation of disparate treatment, the Amended Complaint fails to state an equal protection claim under the Fifth Amendment.

## CONCLUSION

For the reasons set forth above, we conclude that the Amended Complaint fails to state a claim under either the First or Fifth Amendments to the U.S. Constitution. In so concluding, we express no view on the "propriety or desirability, from a policy standpoint," of the alleged activities of Defendants. *See Laird v. Tatum*, 408 U.S. 1, 15 (1972). Our decision is more narrow: we simply hold that, based on the allegations in the Amended Complaint, Plaintiffs have not pleaded a claim that plausibly suggests their entitlement to relief, and therefore the district court's dismissal of this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure was not in error.

The judgment of the district court is **AFFIRMED.**