RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARTHA D. ENGLAND; DUSTIN M. MARTIN; JOSEPHINE THOMAS,

                    *Plaintiffs-Appellants*,

    *v.*

DENSO INTERNATIONAL AMERICA INC., et al.,

                    *Defendants-Appellees*.

> No. 24-1360

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-11129—Mark A. Goldsmith, District Judge.

Argued: January 30, 2025

Decided and Filed: May 6, 2025

Before: McKEAGUE, GRIFFIN, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Paul M. Secunda, WALCHESKE & LUZI, LLC, Brookfield, Wisconsin, for Appellants. René E. Thorne, JACKSON LEWIS, New Orleans, Louisiana, for Appellees. **ON BRIEF:** Paul M. Secunda, WALCHESKE & LUZI, LLC, Brookfield, Wisconsin, for Appellants. René E. Thorne, Matthew T. Biggers, JACKSON LEWIS, New Orleans, Louisiana, Michael E. Holzapfel, JACKSON LEWIS, P.C., Tinton Falls, New Jersey, for Appellees.

───────────────

## OPINION

───────────────

GRIFFIN, Circuit Judge. In this putative class action, plaintiffs claim that defendant DENSO's 401(k) Plan overpaid for recordkeeping and administrative services. In their view, the Plan's substantial assets and the commoditized nature of those third-party services required the

Plan's fiduciaries to use their significant bargaining power to negotiate lower fees and their subsequent failure to do so breached their duty of prudence in violation of the Employee Retirement Income Security Act of 1974 (ERISA). The district court dismissed plaintiffs' complaint for failing to set forth the required "context specific" facts—such as the types and quality of services provided—to render plausible an ERISA overpayment-for-recordkeeping-services claim. We agree and affirm.

I.

At the motion-to-dismiss stage, we assume as true the facts alleged in plaintiffs' complaint. *Mynatt v. United States*, 45 F.4th 889, 893 (6th Cir. 2022).

Here, plaintiffs allege the following facts. Defendant DENSO International America, Inc., makes auto parts. It sponsors and provides to its employees a 401(k) defined contribution pension plan, known as the DENSO Retirement Savings Plan. ERISA governs the Plan. *See* 29 U.S.C. § 1002(34). DENSO, its National Retirement Committee, and the individual defendants (DENSO's president and individual members of DENSO's National Retirement Committee) are the Plan's ERISA fiduciaries (collectively, defendants). Plaintiffs are current and former DENSO employees who participate in the Plan.

As of 2020, the Plan had about 14,000 participants and over $1.7 billion in assets—more participants and assets than 99% of other plans in the United States. Because the Plan has more than $500 million in assets, plaintiffs deem it a "mega 401(k) Plan." "Mega plans" contract with third-party recordkeeping companies for "all the essential recordkeeping and related administrative ('RKA') services through standard, bundled offerings of the same level and quality." Such mega plans possess significant bargaining power when selecting recordkeeping services; accordingly, "the fees that recordkeepers have been willing to accept for providing retirement plan services ha[ve] significantly decreased." That is, increased competition for recordkeeping services has resulted in lower fees for those services.

Empower is the Plan's recordkeeper. It provides "Bundled RKA" services, charging one rate for a package of recordkeeping services instead of separately billing for each specific service. "Bundled RKA" services "include, but are not limited to, . . . standard services" like

recordkeeping, transaction processing, administrative services, participant communications, maintenance of an employer stock fund, plan document services, plan consulting services, accounting and audit services, compliance support, and compliance testing.

Between 2016 and 2020, the Plan paid Empower "approximately $71 per participant" for its recordkeeping and administrative services. That amount is more than double what plaintiffs assert it should have been. For support, plaintiffs set forth a table of 15 "comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services" that pay recordkeeping fees ranging from $25 to $39 per participant. And plaintiffs display this data in a graph showing the "trend line" for RKA fees in comparable plans. Based on this comparison with other plans' fees, plaintiffs allege that the Plan's contract with Empower led to "lower net returns" because of "excessive" and "objectively unreasonable" recordkeeping fees to the tune of an extra $39 per participant per year, totaling over $3.4 million over the applicable period.

In relation to the comparators' fees, the Plan, plaintiffs claim, was "excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the DENSO Plan, regardless of the number or level of services selected by the Plan." Put differently, "the disparity between the Plan's recordkeeping fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services, or the quality of those services, provided by Empower to the Plan." Moreover, "[a]ny differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for RKA services and what the reasonable fair market fee was for identical services," and "any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers."

Plaintiffs assert that "a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line." Had defendants done so, plaintiffs would have seen greater returns from their pensions. Therefore, plaintiffs claim, defendants breached ERISA's duty of prudence and the derivative

duties to monitor that selection of its recordkeeper.[1]  On defendants' motion to dismiss, the district court disagreed with plaintiffs and entered judgment in defendants' favor.  Plaintiffs appeal.

## II.

Under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  That means the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  If plaintiffs do not "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.  When considering a motion to dismiss, we must accept as true all factual allegations, but we need not accept any legal conclusions.  *Napolitano*, 648 F.3d at 369.  Further, we read the complaint's allegations "as a whole."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011).  We review de novo a district court's grant of a motion to dismiss.  *Napolitano*, 648 F.3d at 369.

## III.

ERISA requires plan fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  Informed by trust law, this "duty of prudence" imposes on a fiduciary "a continuing duty of some kind to monitor investments and remove imprudent ones."  *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).  "Because the content of the duty of prudence turns on 'the circumstances prevailing' at the time the fiduciary

---

[1]Plaintiffs also alleged other claims concerning defendants' fund selection, but the district court dismissed those claims, and plaintiffs do not appeal those dismissals.

acts, the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (alteration and internal citation omitted) (quoting § 1104(a)(1)(B)). Moreover, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

Whether a complaint plausibly alleges an ERISA breach-of-duty-of-prudence claim "requires 'careful, context-sensitive scrutiny of a complaint's allegations' in order to 'divide the plausible sheep from the meritless goats.'" *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1164 (6th Cir. 2022) (quoting *Fifth Third*, 573 U.S. at 425). Doing so usually requires identifying the alleged problematic financial metric and then comparing it to a "meaningful benchmark." *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022); *see also Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 216 (6th Cir. 2024). For excessive-recordkeeping claims, this means "plead[ing] that the services that [the plan]'s fee covers are equivalent" in type and quality of comparators' services. *Smith*, 37 F.4th at 1169. That is, a plaintiff must "allege that the fees were excessive relative to the services rendered" or establish "other factors relevant to determining whether a fee is excessive under the circumstances." *Id.* (citation omitted).

Measured against these standards, nothing in plaintiffs' complaint permits us to reasonably infer a breach of the duty of prudence. As the district court astutely observed, the complaint provides no details about the specific types or quality of services that the comparator plans received relative to those the DENSO plan received. *See id.* Indeed, the complaint admits that there are "variations in the level and quality of RKA services" provided to mega plans. Although it attempts to characterize these differences as "immaterial," it provides us with no way to determine that conclusion's plausibility. That failure to explain these differences or demonstrate a meaningful benchmark leaves us unable to evaluate "whether [the] fee is excessive *under the circumstances*." *Id.* (citation omitted) (emphasis added).

We are in good company in so concluding, as many of our sister circuits have found implausible similar complaints in which the plaintiffs "allege[d] next to nothing about the recordkeeping services provided by the Plan or by the . . . lower-priced comparators." *Singh v. Deloitte LLP*, 123 F.4th 88, 94 (2d Cir. 2024); *see also Boyette v. Montefiore Med. Ctr.*, 2025 WL 48108, at *1–2 (2d Cir. Jan 8, 2025); *Matney v. Barrick Gold of N.A.*, 80 F.4th 1136, 1158 (10th Cir. 2023); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579–80 (7th Cir. 2022). And the same conclusion follows when a complaint, like plaintiffs' here, makes generic allegations about similar services across the industry and about mega plans' ability to "'negotiate favorable rates' based on economies of scale," which says nothing about the disparity in services to sufficiently move the needle from implausible to plausible. *Singh*, 123 F.4th at 91, 95. In short, there is a distinction between generally alleging that bundled recordkeeping and administrative services provided to mega plans all offer essentially the same thing and alleging that the services offered to and utilized by the Plan here did not justify the cost difference in fees; here, plaintiffs alleged the former, and under *Smith*, they needed to sufficiently allege the latter.

Furthermore, even if we accepted plaintiffs' position that fungibility excuses the need to detail the services offered, their "own allegations, however sparse, show a range of recordkeeping fees even among the . . . comparator plans, belying the implication that the allegation of a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence." *Id.* at 95. That is, the RKA fees charged by the alleged comparators vary considerably—there is a 56% difference between the lowest competitor (JBS, $25) and the highest (Dollar General, $39). Consider too that six of the alleged comparators have assets less than $500 million dollars—with the lowest being $107,652,510 (Vibra)—and thus do not even fit plaintiffs' definition of "mega plans." Other differences abound, including only three of the comparators having assets over $1 billion (like the Plan).

Plaintiffs push back on this conclusion by asserting that *Smith* "only 'held the complaint was properly dismissed because the plaintiff's only comparators were averages from an industry publication.'" (Quoting *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 188 (3d Cir. 2024)). Their "only" limiter exists nowhere in *Smith*, which made clear that the pleading standard requires a

plaintiff to overcome an "excessive relative to the services rendered" hurdle. 37 F.4th at 1169. The *Smith* plaintiffs could not clear that bar because they pointed to only industry publications for comparator purposes. Interpreting *Smith* to mean that anything other than industry publications is enough would limit *Smith*'s rule to its factual application. That we will not do.

Nor does the Seventh Circuit's decision in *Hughes v. Northwestern University* change this conclusion. That matter also involved a fungibility allegation—that "recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans." 63 F.4th 615, 632 (7th Cir. 2023). The plaintiffs in *Hughes* further alleged that recordkeepers in the market "are *equally* capable of providing a high level of service to large defined contribution plans." *Id.* And they alleged that $35 per participant was "a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the [p]lans' features." *Id.* Those allegations, the Seventh Circuit held, were enough to "plead that the fees were excessive relative to the recordkeeping services rendered." *Id.* With that, and the plaintiffs' identification of several other universities that "successfully reduced recordkeeping fees by soliciting competitive bids, consolidating to a single recordkeeper, and negotiating rebates," the Seventh Circuit concluded that the "plaintiffs have plausibly alleged that Northwestern violated its duty of prudence by incurring unreasonable recordkeeping fees." *Id.* (footnote omitted).

But *Hughes* conflicts with *Smith*'s demand for context-specific facts showing that fees are "excessive relative to the services rendered." *Smith*, 37 F.4th at 1169.[2] The general allegation that comparable recordkeepers are "*equally* capable of providing a high level of service" may have been enough for the *Hughes* court, but it is not specific enough for this one. That allegation explains neither what a "high level of service" is and what services the plan utilized, nor whether those services were comparable to those provided to the asserted competitors.

---

[2]The same can be said for other decisions involving facts closer to *Hughes* that followed *Hughes*'s reasoning. *See Perkins v. United Surgical Partners Int'l, Inc.*, 2024 WL 1574342, at *4–5 (5th Cir. April 11, 2024); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 330–31, 332 (3d Cir. 2019).

And even were we to accept *Hughes*'s premise as consistent with our caselaw, lacking here is a specific allegation that Empower's competitors could have stood in its shoes for less money. What is more, the complaint here does not allege details like those alleged in *Hughes*—that Northwestern could have consolidated from two recordkeepers to one and that four other universities had successfully leveraged their market power to negotiate lower fees. 63 F.4th at 632–33. As the Second Circuit observed in making this same differentiation in *Singh*, the allegations in *Hughes*, "considered together," made that claim plausible, but the "sparse allegations here are simply not comparable." *Singh*, 123 F.4th at 97.

*Singh* similarly aids in distinguishing plaintiffs' remaining published out-of-circuit case, *Mator*, 102 F.4th at 172. As with *Hughes*, *Mator* involved allegations of fungibility and alleged comparator plans obtaining similar services for a smaller fee. *Id*. at 179–81. But that is where the similarities end. Unlike here, the RKA services firm there was paid through both direct and indirect fees, meaning it received a flat, per-participant fee *and* uncapped fees based on revenue sharing (which the plaintiffs alleged increased fees without an increase in services). *Id.* at 179. The plan in *Mator*, unlike the one here, eventually switched recordkeeping providers and paid "a much lower flat fee" without seeing a reduction in services or quality—thus demonstrating the unreasonableness of the challenged fee arrangement. *Id.* at 181. And unlike here, the plaintiffs there set forth the specific services provided to the plan. *Id.* at 179. Taken together, these allegations, concluded the Third Circuit, adequately stated a claim for breach of the duty of prudence. *Id.* at 185–88. Because of these differences, *Mator* is of no moment. *See Singh*, 123 F.4th at 97 (similarly distinguishing *Mator*).

IV.

For these reasons, we affirm the district court court's judgment.