FISHER, Circuit Judge.
 

 Plaintiffs Jennifer Sweda, Benjamin Wiggins, Robert Young, Faith Pickering, Pushkar Sohoni, and Rebecca Toner, representing a class of participants in the University of Pennsylvania's 403(b) defined contribution, individual account, employee pension benefit plan, sued Defendants, the University of Pennsylvania and its appointed fiduciaries, for breach of fiduciary duty, prohibited transactions, and failure to monitor fiduciaries under the Employee Retirement Income Security Act (ERISA),
 
 29 U.S.C. §§ 1001
 
 - 1461. Plaintiffs (collectively, "Sweda") alleged that Defendants (collectively, "Penn"), among other things, failed to use prudent and loyal decision making processes regarding investments and administration, overpaid certain fees by up to 600%, and failed to remove underperforming options from the retirement plan's offerings. The District Court dismissed Sweda's complaint in its entirety. We will reverse the District Court's dismissal of the breach of fiduciary duty claims at Counts III and V only and remand for further proceedings.
 

 I.
 

 Sweda and her fellow Plaintiffs-Appellants are current and former Penn employees who participate, or participated, in Penn's retirement plan (the "Plan"). They sought to represent the proposed class of Plan participants, 20,000 current and former Penn employees who had participated in the Plan since August 10, 2010. The Defendants are the University of Pennsylvania, its Investment Committee, and Jack Heuer, the University's Vice President of Human Resources. The Plan is a defined contribution plan under
 
 29 U.S.C. § 1002
 
 (34), tax qualified under
 
 26 U.S.C. § 403
 
 (b). The University matches employees' contributions up to 5% of compensation.
 

 As a 403(b), the Plan offers mutual funds and annuities: the former through TIAA-CREF and Vanguard Group, Inc. and the latter through TIAA-CREF. Since 2010, the Plan has offered as many as 118 investment options. As of December 2014, the Plan offered 78 options: 48 Vanguard mutual funds, and 30 TIAA-CREF options including mutual funds, fixed and variable annuities, and an insurance company separate account. Effective October 19, 2012, Penn organized its investment fund lineup into four tiers. The TIAA-CREF and Vanguard options under Tier 1 consisted of lifecycle or target-date funds for the "Do-it-for-me" investor. Certain core funds were designated Tier 2, designed for the "Help-me-do-it" investor looking to be involved in his or her investment choices without having to decide among too many options. Under Tier 3, the Plan offered an "expanded menu of funds" for "the more advanced 'mix-my-own' investor," and under Tier 4, the Plan offered the option of a brokerage account window for the "self-directed" investor looking for additional options, subject to additional fees. Plan participants thereafter could "select a combination of funds from any or all of the investment tiers." At the end of 2014, the Plan had $ 3.8 billion in assets: $ 2.5 billion invested in TIAA-CREF options, and $ 1.3 billion invested in Vanguard options.
 

 TIAA-CREF and Vanguard charge investment and administrative (recordkeeping) fees. Mutual fund investment fees are charged as a percentage of a fund's managed assets, known as the expense ratio, and the rate can differ by share class. The mutual funds in which the Plan invests have two share classes: retail and institutional. Retail class shares generally have higher investment fees than institutional class shares. There are also two common
 recordkeeping fee models. In a flat fee model, recordkeeping fees are a set amount per participant, whereas in a revenue sharing model, part of an option's expense ratio is diverted to administrative service providers. TIAA-CREF and Vanguard charged the Plan under the revenue sharing model.
 

 Sweda alleged numerous breaches of fiduciary duty and prohibited transactions. She brought six counts against all Defendants, and one count against the University. The first six counts alleged breaches of fiduciary duty in violation of
 
 29 U.S.C. § 1104
 
 (a)(1) (Counts I, III, and V) and prohibited transactions in violation of
 
 29 U.S.C. § 1106
 
 (a)(1) (Counts II, IV, and VI). Sweda also alleged that the University failed to adequately monitor its appointed fiduciaries in Count VII.
 

 Penn moved to dismiss the complaint, and the District Court granted the motion. The court determined that Sweda failed to state a claim for fiduciary breach under
 
 Bell Atl. Corp. v. Twombly
 
 ,
 
 550 U.S. 544
 
 ,
 
 127 S.Ct. 1955
 
 ,
 
 167 L.Ed.2d 929
 
 (2007) and
 
 Renfro v. Unisys Corp.
 
 ,
 
 671 F.3d 314
 
 (3d Cir. 2011), because her factual allegations could also indicate rational conduct. As for the prohibited transaction claims, the court held that the service agreements could not constitute prohibited transactions without an allegation that Penn had the subjective intent to benefit a party in interest. The court dismissed Count VII after determining that it was duplicative of the claims at Counts I, III, and V.
 
 [1]
 
 Sweda now appeals.
 

 II.
 

 The District Court had jurisdiction under
 
 28 U.S.C. § 1331
 
 and
 
 29 U.S.C. § 1132
 
 (e)(1) and (f). We have jurisdiction under
 
 28 U.S.C. § 1291
 
 . We conduct plenary review of an order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure (12)(b)(6).
 
 Renfro
 
 ,
 
 671 F.3d at
 
 320 ;
 
 Burtch v. Milberg Factors, Inc.
 
 ,
 
 662 F.3d 212
 
 , 220 (3d Cir. 2011).
 

 III.
 

 A.
 
 Pleadings standards for claims brought under ERISA
 

 The question in this case is whether Sweda stated a claim that should survive termination at the earliest stage in litigation. When a court grants a motion to dismiss a complaint under Rule 12(b)(6), it deprives a plaintiff of the benefit of the court's adjudication of the merits of its claim before the court considers any evidence. That is why, in exercising our plenary review, we apply the same standard as the district court and construe the complaint "in the light most favorable to the plaintiff,"
 
 Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.
 
 ,
 
 768 F.3d 284
 
 , 290 (3d Cir. 2014) (citation and internal quotation marks omitted), to determine whether it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' "
 
 Ashcroft v. Iqbal
 
 ,
 
 556 U.S. 662
 
 , 678,
 
 129 S.Ct. 1937
 
 ,
 
 173 L.Ed.2d 868
 
 (2009) (quoting
 
 Bell Atl. Corp. v. Twombly
 
 ,
 
 550 U.S. 544
 
 , 570,
 
 127 S.Ct. 1955
 
 ,
 
 167 L.Ed.2d 929
 
 (2007) ). "[W]e disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements."
 
 James v. City of Wilkes-Barre
 
 ,
 
 700 F.3d 675
 
 , 679 (3d Cir. 2012). A claim "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
 

 Thompson v. Real Estate Mortg. Network,
 

 748 F.3d 142
 
 , 147 (3d Cir. 2014) (citation and internal quotation marks omitted).
 

 Here, the District Court held that Sweda's complaint did not state a plausible claim, observing at various points in its memorandum that "[a]s in
 
 Twombly
 
 , the actions are at least 'just as much in line with a wide swath of rational and competitive business strategy' in the market as they are with a fiduciary breach."
 
 Sweda v. Univ. of Pennsylvania
 
 , No. CV 16-4329,
 
 2017 WL 4179752
 
 , at *7, 8 (E.D. Pa. Sept. 21, 2017) (quoting
 
 Twombly
 
 ,
 
 550 U.S. at 554
 
 ,
 
 127 S.Ct. 1955
 
 ). However,
 
 Twombly
 
 's discussion of alleged misconduct that is "just as much in line with a wide swath of rational and competitive business strategy" is specific to antitrust cases.
 
 550 U.S. at 554
 
 ,
 
 127 S.Ct. 1955
 
 . In an antitrust case, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality," therefore "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."
 

 Id.
 

 at 557
 
 ,
 
 127 S.Ct. 1955
 
 .
 

 One of our sister circuits has declined to extend
 
 Twombly
 
 's antitrust pleading rule to breach of fiduciary duty claims under ERISA because "[r]equiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party."
 
 Braden v. Wal-Mart Stores, Inc.
 
 ,
 
 588 F.3d 585
 
 , 597 (8th Cir. 2009) (citation and internal quotation marks omitted). We agree, and decline to extend
 
 Twombly
 
 's antitrust pleading rule to such claims. To the extent that the District Court required Sweda to rule out lawful explanations for Penn's conduct, it erred.
 

 We now turn to the task of evaluating Sweda's complaint. We progress in three steps: First, we will note the elements of a claim; second, we will identify allegations that are conclusory and therefore not assumed to be true, and; third, accepting the factual allegations as true, we will view them and reasonable inferences drawn from them in the light most favorable to Sweda to decide whether "they plausibly give rise to an entitlement to relief."
 
 Connelly v. Lane Constr. Corp.
 
 ,
 
 809 F.3d 780
 
 , 787 (3d Cir. 2016) (quoting
 
 Iqbal
 
 ,
 
 556 U.S. at 679
 
 ,
 
 129 S.Ct. 1937
 
 ).
 
 [2]
 
 Pleadings that establish only a mere possibility of misconduct do not show entitlement to relief.
 
 Fowler
 
 , 578 F.3d at 211.
 

 In our evaluation of the complaint, we must account for the fact that Rule 8(a)(2),
 
 Twombly
 
 , and
 
 Iqbal
 
 operate with contextual specificity.
 
 Renfro
 
 ,
 
 671 F.3d at 321
 
 ("[W]e must examine the context of a claim, including the underlying substantive law, in order to assess its plausibility."). Therefore, ERISA's purpose informs our assessment of Sweda's pleadings. ERISA's protective function is the focal point of the statute. The statute plainly states that ERISA is a response to "the lack of employee information and adequate safeguards concerning [employee benefit plans'] operation," and adds that ERISA reflects Congress's desire "that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans."
 
 29 U.S.C. § 1001
 
 (a). This Court has repeatedly
 acknowledged and affirmed ERISA's protective function.
 
 See e.g.
 

 McCann v. Unum Provident
 
 ,
 
 907 F.3d 130
 
 , 143 (3d Cir. 2018) ;
 
 Edmonson v. Lincoln Nat'l Life Ins. Co.
 
 ,
 
 725 F.3d 406
 
 , 413 (3d Cir. 2013) ;
 
 Nat'l Sec. Sys., Inc. v. Iola
 
 ,
 
 700 F.3d 65
 
 , 81 (3d Cir. 2012). ERISA furthers "the national public interest in safeguarding anticipated employee benefits" upon which individuals' livelihoods depend.
 
 Cutaiar v. Marshall
 
 ,
 
 590 F.2d 523
 
 , 529 (3d Cir. 1979).
 

 ERISA also "represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans."
 
 Fifth Third Bancorp v. Dudenhoeffer
 
 ,
 
 573 U.S. 409
 
 ,
 
 134 S.Ct. 2459
 
 , 2470,
 
 189 L.Ed.2d 457
 
 (2014) (citations and internal quotation marks omitted);
 
 In re Unisys Sav. Plan Litig.
 
 ,
 
 74 F.3d 420
 
 , 434 (3d Cir. 1996) (ERISA "protect[s] and strengthen[s] the rights of employees" and "encourage[s] the development of private retirement plans."). Plan sponsors and fiduciaries have reliance interests in the courts' interpretation of ERISA when establishing plan management practices. ERISA " 'induc[es] employers to offer benefits by assuring a predictable set of liabilities.' "
 
 Renfro
 
 ,
 
 671 F.3d at 321
 
 (quoting
 
 Rush Prudential HMO, Inc. v. Moran
 
 ,
 
 536 U.S. 355
 
 , 379,
 
 122 S.Ct. 2151
 
 ,
 
 153 L.Ed.2d 375
 
 (2002) ). Both pursuits-participant protection and plan creation-are important considerations at the pleadings stage.
 

 Two sections of the statute are particularly important to this appeal: the section outlining fiduciary duties,
 
 29 U.S.C. § 1104
 
 , and the section prohibiting certain transactions,
 

 id.
 

 § 1106. Under § 1104(a), fiduciaries are held to the prudent man standard of care,
 
 [3]
 
 which is drawn from trust law.
 
 Tibble v. Edison Int'l
 
 (
 
 Tibble III
 
 ), --- U.S. ----,
 
 135 S.Ct. 1823
 
 , 1828,
 
 191 L.Ed.2d 795
 
 (2015) ;
 
 In re Unisys
 
 ,
 
 74 F.3d at 434
 
 ("Congress has instructed that section 1104 'in essence, codifies and makes applicable to ... fiduciaries certain principles developed in the evolution of the law of trusts.' ") (quoting S. Rep. No. 127, 93 Cong., 2d Sess. (1974)). Section 1104(a) lays the foundation of fiduciary duty, and § 1106(a)"[s]upplement[s] that foundational obligation" by "erect[ing] a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan."
 
 Nat'l Sec. Sys., Inc.
 
 , 700 F.3d at 82.
 

 The standards for fiduciary conduct in §§ 1104 and 1106 may overlap. When evaluating whether there has been a breach of fiduciary duties under § 1104, courts may consider the administrator's need to "defray[ ] reasonable expenses of administering [a] plan."
 
 29 U.S.C. § 1104
 
 (a)(1)(A)(ii). A prohibited transactions claim under § 1106 might also involve expense-related transactions between a plan and party in interest.
 

 Id.
 

 § 1106(a)(1)(C). Despite the overlap, a fiduciary who breaches the duties under § 1104(a) does not necessarily violate § 1106(a). Because Sweda alleged that Penn breached its fiduciary duties and caused the Plan to engage in prohibited transactions, we will first address claims under § 1104(a)(1) (Counts I, III, and V), and then address her claims under § 1106(a)(1) (Counts II, IV, and VI).
 

 B.
 
 Section 1104(a)(1) claims (Counts I, III, and V)
 

 1.
 
 Elements of a claim under § 1104(a)(1)
 

 In reviewing the District Court's dismissal of Sweda's fiduciary breach
 claims, our first task is to identify the elements of such a claim. They are: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan."
 
 Leckey v. Stefano
 
 ,
 
 501 F.3d 212
 
 , 225-26 (3d Cir. 2007), as amended (Dec. 21, 2007). Because the parties do not dispute that Penn is a fiduciary or whether loss was adequately alleged, our focus is whether Sweda adequately alleged that Penn breached its fiduciary duties. A fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries; and ... defraying reasonable expenses of administering the plan."
 
 29 U.S.C. § 1104
 
 (a)(1), (a)(1)(A). As explained above, fiduciaries are held to the "prudent man" standard of care, which requires fiduciaries to exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."
 

 Id.
 

 § 1104(a)(1)(B). Fiduciaries are also required to diversify investments unless it would be imprudent,
 
 [4]
 
 and to administer the plan according to governing documents and instruments.
 

 Id.
 

 § 1104(a)(1)(C), (D). Fiduciaries are personally liable for losses due to breach.
 

 Id.
 

 § 1109(a).
 

 A fiduciary must prudently select investments, and failure to "monitor ... investments and remove imprudent ones" may constitute a breach.
 
 See
 

 Tibble III
 
 ,
 
 135 S.Ct. at
 
 1828-29 ;
 
 see also
 

 29 C.F.R. § 2550
 
 .404a-1(b)(1)(i) (fiduciaries must give "appropriate consideration to those facts and circumstances that ... the fiduciary knows or should know are relevant to the particular investment or investment course of action involved");
 
 see also
 

 Fink v. Nat'l Sav. & Trust Co.
 
 ,
 
 772 F.2d 951
 
 , 957 (D.C. Cir. 1985) ("investigation of the merits of a particular investment is at the heart of the prudent person standard"). Fiduciaries must also understand and monitor plan expenses. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,"
 
 Tibble III
 
 ,
 
 135 S.Ct. at 1826
 
 , by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees. Recognizing the substantial impact of a fiduciary's choice among fee options, the Ninth Circuit, in
 
 Tibble v. Edison Int'l
 
 (
 
 Tibble II
 
 ), affirmed the district court's finding that the plan fiduciary's inclusion of retail class shares of three funds when institutional class shares of the same funds were available for 24 to 40 fewer basis points, was a fiduciary breach.
 
 729 F.3d 1110
 
 , 1137-39 (9th Cir. 2013),
 
 vacated on other grounds
 
 , --- U.S. ----,
 
 135 S.Ct. 1823
 
 ,
 
 191 L.Ed.2d 795
 
 (2015).
 

 Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue sharing will be credited to the plan and paid back to the plan or to plan service providers." DOL Advisory Opinion 2013-03A,
 
 2013 WL 3546834
 
 , at *4.
 
 [5]
 
 Fiduciaries
 must also consider a plan's "power ... to obtain favorable investment products, particularly when those products are substantially identical-other than their lower cost-to products the trustee has already selected."
 
 Tibble v. Edison Int'l
 
 (
 
 Tibble IV
 
 ),
 
 843 F.3d 1187
 
 , 1198 (9th Cir. 2016).
 
 See
 

 Tibble II
 
 ,
 
 729 F.3d at
 
 1137 n.24 (common knowledge that investment minimums are often waived for large plans). When expenses are paid from plan assets, fiduciaries must ensure that the assets are used "for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan." DOL Advisory Opinion 2001-01A,
 
 2001 WL 125092
 
 , at *1.
 
 See
 

 29 U.S.C. § 1104
 
 (a)(1)(A).
 

 Bearing these fiduciary duties in mind, a court assesses a fiduciary's performance by looking at process rather than results, "focusing on a fiduciary's conduct in arriving at [a] ... decision ... and asking whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment."
 
 In re Unisys
 
 ,
 
 74 F.3d at 434
 
 (citations omitted). A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. "[A] pure heart and an empty head are not enough."
 
 DiFelice v. U.S. Airways
 
 ,
 
 Inc.
 
 ,
 
 497 F.3d 410
 
 , 418 (4th Cir. 2007) (quoting
 
 Donovan v. Cunningham
 
 ,
 
 716 F.2d 1455
 
 , 1467 (5th Cir. 1983) ). Many allegations concerning fiduciary conduct, such as reasonableness of "compensation for services" are "inherently factual question[s]" for which neither ERISA nor the Department of Labor give specific guidance. DOL Advisory Opinion 2013-03A,
 
 2013 WL 3546834
 
 , at *4-5.
 

 In
 
 Renfro
 
 , we established the pleading standard for breach of fiduciary duty under ERISA after examining the reasoning of other Circuits that had addressed the issue in light of
 
 Twombly
 
 and
 
 Iqbal
 
 , particularly
 
 Hecker v. Deere & Co.
 
 ,
 
 556 F.3d 575
 
 (7th Cir. 2009), and
 
 Braden v. Wal-Mart Stores, Inc.
 
 ,
 
 588 F.3d 585
 
 (8th Cir. 2009). The
 
 Renfro
 
 plaintiffs challenged the mix and range of investment options in their retirement plan, the use of asset-based rather than per-participant fees, and the alleged imbalance of the fees charged and services rendered.
 
 671 F.3d at 326
 
 . The district court granted defendants' motion to dismiss, holding that "the plan offered a sufficient mix of investments ... [such] that no rational trier of fact could find, on the basis of the facts alleged in the operative complaint, that the ... defendants breached an ERISA fiduciary duty by offering [that] particular array of investment vehicles."
 

 Id.
 

 at 320
 
 (citations and internal quotation marks omitted).
 

 We affirmed.
 

 Id.
 

 at 327-28
 
 . We determined that we could not "infer from what [was] alleged that the [fiduciary's] process was flawed."
 

 Id.
 

 at 327
 
 (quoting
 
 Braden
 
 ,
 
 588 F.3d at
 
 596 ). We held that ERISA plans should offer meaningful choices to their participants, and that:
 

 [T]he range of investment options and the characteristics of those included options-including the risk profiles, investment strategies, and associated fees-are highly relevant and readily ascertainable facts against which the plausibility of claims challenging the overall composition of a plan's mix and range of investment options should be measured.
 

 Id
 
 . We explained that a fiduciary breach claim must be examined against the backdrop of the mix and range of available investment options.
 

 Id.
 

 We did not hold, however, that a meaningful mix and range of investment options insulates plan fiduciaries from liability for breach of fiduciary duty. Such a standard would allow a fiduciary to avoid liability by stocking a plan with hundreds of options, even if the majority were overpriced or underperforming. One important reason why we cannot read
 
 Renfro
 
 to establish such a bright-line rule (that providing a range of investment options satisfies a fiduciary's duty) is that ERISA fiduciaries have a duty to act prudently according to current practices-as the statute puts it, the "circumstances then prevailing."
 
 29 U.S.C. § 1104
 
 (a)(1)(B). Practices change over time, and bright line rules would hinder courts' evaluation of fiduciaries' performance against contemporary industry practices. Bearing these things in mind, we turn to Sweda's complaint to determine whether she adequately alleged fiduciary breach in Counts I, III, and V.
 

 2.
 
 Conclusory allegations of fiduciary breach
 

 First, we must eliminate conclusory allegations from the complaint.
 
 Connelly
 
 ,
 
 809 F.3d at 787
 
 . Sweda included a few conclusory allegations, such as "a prudent process would have produced a different outcome," Am. Compl. ¶75, but conclusory statements of that variety are rare in the complaint, and after discarding them, many well-pleaded factual allegations remain.
 

 3.
 
 Well-pleaded facts alleging breach of fiduciary duty
 

 Sweda alleged that Penn was "responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation." Am. Compl. ¶36. She also alleged that Penn was responsible for the menu of investment options available to participants.
 

 Id.
 

 In Count I, she alleged that Penn entered a "lock-in" agreement with TIAA-CREF that mandated inclusion of the CREF Stock and Money Market accounts, and required the Plan to use TIAA-CREF as a recordkeeper. Am. Compl. ¶86.
 

 In Count III, Sweda alleged that Penn paid excessive administrative fees, failed to solicit bids from service providers, failed to monitor revenue sharing, failed to leverage the Plan's size to obtain lower fees or rebates, and failed to comprehensively review Plan management. Specifically, Sweda alleged that the Plan paid between $ 4.5 and $ 5.5 million in annual recordkeeping fees at a time when similar plans paid $ 700,000 to $ 750,000 for the same services. Sweda also alleged that percentage-based fees went up as assets grew, despite there being no corresponding increase in recordkeeping services. Sweda alleged that Penn could have negotiated for a cap on fees or renegotiated the fee structure, but failed to do either. Sweda also alleged that Penn could have assessed the reasonableness of Plan recordkeeping fees by soliciting competitive bids, but, unlike prudent fiduciaries, failed to do so. For contrast, Sweda offered examples of similarly situated fiduciaries who acted prudently, such as fiduciaries at Loyola Marymount who hired an independent consultant to request recordkeeping proposals
 and consolidated services with a single provider. Sweda pointed to similar moves at Pepperdine, Purdue, and CalTech, as well as Caltech's negotiation for $ 15 million in revenue sharing rebates. Sweda alleged that unlike those organizations, Penn failed to review Plan management, and fell behind other fiduciaries in the industry.
 

 In Count V, Sweda alleged that Penn breached its fiduciary duties by: paying unreasonable investment fees, including and retaining high-cost investment options with historically poor performance compared to available alternatives, and retaining multiple options in the same asset class and investment style. Specifically, Sweda alleged that despite the availability of low-cost institutional class shares, Penn selected and retained identically managed but higher cost retail class shares. She included a table comparing options in the Plan with the readily available cheaper alternatives.
 
 [6]
 
 Sweda also alleged that some options in the line-up had layers of unnecessary fees. Not only did Sweda allege that the options Penn selected and retained were imprudently costly, she also alleged that they were duplicative thereby decreasing the value of actively managed funds, reducing the Plan's leverage, and confusing participants. Sweda also alleged that 60% of Plan options underperformed appropriate benchmarks, and that Penn failed to remove underperformers. Sweda pointed to the CREF Stock Account and TIAA Real Estate Account as examples of consistent underperformers. She alleged that Penn's process of selecting and managing options must have been flawed if Penn retained expensive underperformers over better performing, cheaper alternatives. At this stage, her factual allegations must be taken as true, and every reasonable inference from them must be drawn in her favor.
 
 Connelly
 
 ,
 
 809 F.3d at 790
 
 .
 

 4.
 
 Sweda plausibly stated a claim in Counts III and V
 

 At this final step, we employ a holistic approach, considering all of Sweda's well-pleaded factual allegations including the range of investment options alongside other germane factors such as reasonableness of fees, selection and retention of investment options, and practices of similarly situated fiduciaries, to determine whether her allegations plausibly demonstrate entitlement to relief.
 
 See
 

 Renfro
 
 ,
 
 671 F.3d at
 
 327 ;
 
 see also
 

 Braden
 
 ,
 
 588 F.3d at 598
 
 (statute's remedial scheme "counsel[s] careful and holistic evaluation of an ERISA complaint's factual allegations before concluding that they do not support a plausible inference that the plaintiff is entitled to relief."). The complaint should not be "parsed piece by piece to determine whether each allegation, in isolation, is plausible."
 
 Braden
 
 ,
 
 588 F.3d at 594
 
 .
 
 See
 

 Tatum v. RJR Pension Inv. Comm.
 
 ,
 
 761 F.3d 346
 
 , 360 (4th Cir. 2014) (citing
 
 DiFelice
 
 ,
 
 497 F.3d at
 
 420 ) (courts must look to the totality of the circumstances to assess the prudence of investment decisions).
 

 Sweda plausibly alleged breach of fiduciary duty. Sweda's factual allegations are not merely "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."
 
 Iqbal
 
 ,
 
 556 U.S. at 678
 
 ,
 
 129 S.Ct. 1937
 
 . As recounted above, they are numerous and specific factual allegations that Penn did not perform its fiduciary duties with the level of care, skill, prudence, and diligence to which Plan participants are statutorily entitled under § 1104(a)(1). Sweda offered specific comparisons between returns on Plan investment options and readily available alternatives, as well as practices of similarly situated fiduciaries to show what plan administrators "acting in a like capacity and familiar with such matters would [do] in the conduct of an enterprise of a like character and with like aims."
 
 29 U.S.C. § 1104
 
 (a)(1)(B).
 
 [7]
 
 The allegations plausibly allege that Penn failed to "defray[ ] reasonable expenses of administering the plan" and otherwise failed to "discharge [its] duties" according to the prudent man standard of care.
 

 Id.
 

 § 1104(a)(1)(A)(ii) and (B).
 

 Other appellate courts have found that similar conduct plausibly indicates breach of fiduciary duty. For instance, in
 
 Tussey v. ABB, Inc
 
 ., the Eighth Circuit held that the district court did not err in finding fiduciaries breached their duties by "[failing to] (1) calculate the amount the Plan was paying [the recordkeeper] for recordkeeping through revenue sharing, (2) determine whether [the recordkeeper's] pricing was competitive, [or] (3) adequately leverage the Plan's size to reduce fees," among other things.
 
 746 F.3d 327
 
 , 336 (8th Cir. 2014). In
 
 Tibble IV
 
 , the Ninth Circuit held that whether a fiduciary breached its fiduciary duties by selecting a higher cost share class was an issue requiring development by the district court, and remanded the case for further proceedings.
 
 843 F.3d at 1197-98
 
 .
 

 In dismissing the claims in Counts III and V, the District Court erred by "ignor[ing] reasonable inferences supported by the facts alleged," and by drawing "inferences in [Defendants'] favor, faulting [Plaintiffs] for failing to plead facts tending to contradict those inferences."
 
 Braden
 
 ,
 
 588 F.3d at 595
 
 . While Sweda may not have directly alleged how Penn mismanaged the Plan, she provided substantial circumstantial evidence from which the District Court could "reasonably infer" that a breach had occurred.
 
 Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.
 
 ,
 
 712 F.3d 705
 
 , 718 (2d Cir. 2013) (citation and internal quotation marks omitted). Based on her allegations, the claims in Counts III and V should not have been dismissed.
 

 Penn argues that allowing Sweda to proceed on this complaint ignores fiduciary discretion, and also argues that it in fact employed a prudent process in its
 Plan management. Finally, Penn argues that reversal would overexpose ERISA fiduciaries to liability. According to Penn, ERISA fiduciaries are "afforded a healthy measure of discretion in deciding what is in the plan participants' interests." Br. of Appellees at 2. At oral argument, Penn emphasized fiduciary discretion, calling it the "hallmark of fiduciary activity." Oral Arg. at 25:05. Penn is not incorrect that the exercise of discretionary authority over plan assets is a characteristic of fiduciaries such that courts can identify fiduciaries by this trait,
 
 see
 

 Pohl v. Nat'l Benefits Consultants, Inc
 
 .,
 
 956 F.2d 126
 
 , 129 (7th Cir. 1992), nor is Penn incorrect that discretion is an important aspect of fiduciary behavior that the courts should consider in evaluating fiduciary performance. ERISA fiduciaries, like trustees, are afforded discretion because "[t]here are no universally accepted and enduring theories of financial markets or prescriptions for investment that can provide clear and specific guidance," therefore "[v]aried approaches to the prudent investment" of assets are permissible. Restatement (Third) of Trusts § 90 (2007), cmt. f.
 

 However, while fiduciaries have discretion in plan management, that discretion is bounded by the prudent man standard. Discretion "does not mean ... that the legal standard of prudence is without substantive content or that there are no principles by which the fiduciary's conduct may be guided and judged," rather a fiduciary's conduct at all times "must be reasonably supported in concept and must be implemented with proper care, skill, and caution."
 

 Id.
 

 Fiduciary discretion must be exercised within the statutory parameters of prudence and loyalty.
 
 See
 
 DOL Advisory Op. 2006-08A,
 
 2006 WL 2990326
 
 , at *3. Those parameters impose a fiduciary standard that is considered "the highest known to the law."
 
 Tatum
 
 ,
 
 761 F.3d at 355-56
 
 (quoting
 
 Donovan v. Bierwirth
 
 ,
 
 680 F.2d 263
 
 , 272 n.8 (2d Cir. 1982) ).
 
 See
 

 Varity Corp. v. Howe
 
 ,
 
 516 U.S. 489
 
 , 497,
 
 116 S.Ct. 1065
 
 ,
 
 134 L.Ed.2d 130
 
 (1996) (ERISA fiduciary duty may even exceed fiduciary duty as derived from the common law of trusts). Therefore, while we recognize and appreciate fiduciary discretion, if there is indeed a "hallmark" of fiduciary activity identified in the statute, it is prudence.
 
 See
 

 29 U.S.C. § 1104
 
 (a).
 

 As to Penn's second argument, that it did in fact employ a prudent process, this argument goes to the merits and is misplaced at this early stage. Although Penn may be able to demonstrate that its process was prudent, we are not permitted to accept Penn's account of the facts or draw inferences in Penn's favor at this stage of litigation. Finally, we address Penn's argument, supported by amici including the American Council on Education and the Chamber of Commerce of the United States of America
 
 [8]
 
 , that allowing Sweda's complaint through the 12(b)(6) gate will overexpose plan sponsors and fiduciaries to costly litigation and will discourage them from offering benefit plans at all. Br. of Appellees at 38. Penn predicts that reversal would "give class action lawyers a free ticket to discovery and the opportunity to demand extortionate settlements."
 

 Id.
 

 [9]
 
 Penn's solution is to interpret
 
 Renfro
 
 to mean that if a plan fiduciary provides a
 "mix and range of investment options," plaintiffs cannot plausibly allege breach of fiduciary duty.
 

 The Supreme Court addressed a nearly identical concern in
 
 Fifth Third Bancorp
 
 . There, the defendants "[sought] relief from what they believe[d were] meritless, economically burdensome lawsuits."
 
 134 S.Ct. at 2470
 
 . The Court explained that while Congress, through ERISA, sought to encourage creation of retirement plans, that purpose was not intended to prevent participants with meritorious claims from gaining access to the courts.
 

 Id.
 

 While
 
 Fifth Third
 
 concerned an ESOP plan and defendants' request for a presumption of prudence, its reasoning is apt here. Despite our appreciation of Penn and amici's fear of frivolous litigation, if we were to interpret
 
 Renfro
 
 to bar a complaint as detailed and specific as the complaint here, we would insulate from liability every fiduciary who, although imprudent, initially selected a "mix and range" of investment options. Neither the statute nor our precedent justifies such a rule. We will therefore reverse the District Court's dismissal of the claims in Counts III and V, and remand for further proceedings.
 
 [10]
 

 We will affirm dismissal of Count I because it is time barred.
 

 Fairview Twp. v. U.S. Envtl. Prot. Agency
 
 ,
 
 773 F.2d 517
 
 , 525 n.15 (3d Cir. 1985) (we may affirm on any basis). Sweda limited her claim to the initial agreement between the Plan and TIAA-CREF to include the CREF Stock and Money Market accounts in the Plan, and to use TIAA-CREF for recordkeeping. This agreement was entered into prior to December 31, 2009, and Sweda filed her initial complaint on August 10, 2016. Sweda did not present this claim as an ongoing breach like the petitioners in
 
 Tibble III
 
 , --- U.S. ----,
 
 135 S.Ct. 1823
 
 . Although we must draw every reasonable inference in Sweda's favor, we will not read factual allegations into a complaint. Count I is therefore time barred under the six-year statute of limitations.
 
 29 U.S.C. § 1113
 
 (1).
 
 [11]
 

 C.
 
 Section 1106(a)(1) claims (Counts II, IV, and VI)
 

 1.
 
 Elements of a claim under § 1106(a)(1)
 

 Section 1106(a) supplements the fiduciary duties by specifically prohibiting certain transactions between plans and parties in interest. The elements of a party-in-interest, prohibited transaction claim are: (1) the fiduciary causes (2) a listed transaction to occur (3) between the plan and a party in interest.
 
 29 U.S.C. § 1106
 
 (a)(1). ERISA defines "party in interest" as "a person providing services to such plan."
 
 29 U.S.C. § 1002
 
 (14)(B). Sweda argues that TIAA-CREF and Vanguard are parties in interest according to the plain language of § 1002(14)(B). She also points to a Department of Labor advisory opinion holding that a life insurance company that provided recordkeeping and related services to a retirement plan would be a party in interest under the statute.
 
 See
 
 DOL Advisory Opinion 2013-03A,
 
 2013 WL 3546834
 
 . Importantly, an investment company does not become a party in interest merely because a plan invests in securities issued by the investment company.
 
 29 U.S.C. § 1002
 
 (21)(B).
 

 Fiduciaries are prohibited from causing a plan to engage in the transactions listed at § 1106(a)(1). Those transactions are:
 

 (A) sale or exchange, or leasing, of any property between the plan and a party in interest; (B) lending of money or other extension of credit between the plan and a party in interest; (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.
 

 Between the definition of service providers as parties in interest,
 

 id.
 

 § 1002(14)(B), and this exhaustive list of prohibited transactions, § 1106(a)(1) could be read to have an extremely broad application. Some courts have embraced that breadth and interpreted § 1106(a)(1) to prohibit almost any transaction with a party in interest. The Seventh Circuit, for example, has held that § 1106(a)(1) creates a per se rule
 against party in interest transactions, so that plaintiffs who allege such transactions may do so without even pleading unreasonableness of fees.
 
 Allen v. GreatBanc Trust Co.
 
 ,
 
 835 F.3d 670
 
 , 676 (7th Cir. 2016). In
 
 Allen
 
 , the Seventh Circuit ruled that the exemptions from prohibited transactions, under
 
 29 U.S.C. § 1108
 
 , are affirmative defenses, and that "plaintiff[s] ha[ve] no duty to negate any or all of them" in a complaint.
 

 Id.
 

 It also noted that five other circuits (the Second, Fourth, Fifth, Eighth, and Ninth) have ruled similarly.
 

 Id.
 

 See
 

 Braden
 
 ,
 
 588 F.3d at 600-01
 
 (plaintiff did not have to plead facts "raising a plausible inference that the payments were unreasonable" because exemption in § 1108 is a defense raised by defendant). Responding to concerns about a flood of prohibited transaction claims, the Seventh Circuit reasoned that Rule 11 sanctions and reasonable risk aversion would prevent the floodgates from opening.
 
 Allen
 
 ,
 
 835 F.3d at 677
 
 .
 

 We decline to read § 1106(a)(1) as the Seventh Circuit does because it is improbable that § 1106(a)(1), which was designed to prevent "transactions deemed likely to injure the ... plan" and "self-dealing,"
 
 Nat'l Sec. Sys., Inc.
 
 , 700 F.3d at 92 (citation and internal quotation marks omitted), would prohibit ubiquitous service transactions and require a fiduciary to plead reasonableness as an affirmative defense under § 1108 to avoid suit. Not even Sweda advocates for such a broad reading of § 1106(a)(1), conceding in her complaint that "paying for recordkeeping with asset-based revenue sharing is not [a]
 
 per se
 
 violation of ERISA." Am. Compl. ¶101. One of the reasons we do not find
 
 Allen
 
 persuasive is that the transactions the Seventh Circuit scrutinized in
 
 Allen
 
 were a far cry from the ordinary service arrangements at issue here. In
 
 Allen
 
 , an ESOP fiduciary bought the employer's stock using a loan financed by the principal shareholders of the company. The value of the stock then fell so drastically that "[t]he Plan's participants, all employees of [the company], wound up being on the hook for interest payments on the loan."
 
 Allen
 
 ,
 
 835 F.3d at 673
 
 . A transaction of that variety is far removed from ordinary recordkeeping arrangements. Therefore,
 
 Allen
 
 does not provide sufficient justification to recognize a per se rule that every furnishing of goods or services between a plan and party in interest is a prohibited transaction under § 1106(a)(1).
 

 Our ruling today does not conflict with our earlier decisions holding that transactions between a plan and plan fiduciaries are per se prohibited under § 1106(b).
 
 See
 

 Cutaiar
 
 ,
 
 590 F.2d at
 
 528 ;
 
 see also
 

 Nat'l Sec. Sys., Inc.
 
 , 700 F.3d at 94. In
 
 Cutaiar
 
 , we held that "[w]hen identical trustees of two employee benefit plans whose participants and beneficiaries are not identical effect a loan between the plans without a [ § 1108 ] exemption, a per se violation of ERISA exists" under § 1106(b)(2).
 
 590 F.2d at 529
 
 . In
 
 National Security Systems
 
 , we held that a transaction between a plan and fiduciary that is tainted by self-dealing is a per se violation of § 1106(b)(3)"regardless of the reasonableness of compensation." 700 F.3d at 93. Those cases do not control here because § 1106(a) and (b) have distinct purposes: "[s]ubsection (a) erects a categorical bar to transactions between the plan and a 'party in interest' deemed likely to injure the plan," and "[s]ubsection (b) prohibits plan fiduciaries from entering into transactions with the plan tainted by conflict-of-interest and self-dealing concerns."
 
 Id.
 
 at 82. The protective function of ERISA is at its height in the latter scenario when there is a risk of fiduciary self-dealing. The instances where participants might benefit from a transaction between a plan and a fiduciary are so rare that they can be prohibited outright.
 

 Reading § 1106(a)(1) as a per se rule barring all transactions between a plan and party in interest would miss the balance that Congress struck in ERISA, because it would expose fiduciaries to liability for every transaction whereby services are rendered to the plan.
 
 See
 

 Renfro
 
 ,
 
 671 F.3d at 321
 
 ("In enacting ERISA, Congress 'resolved innumerable disputes between powerful competing interests-not all in favor of potential plaintiffs.' " (quoting
 
 Mertens v. Hewitt Assocs.
 
 ,
 
 508 U.S. 248
 
 , 262,
 
 113 S.Ct. 2063
 
 ,
 
 124 L.Ed.2d 161
 
 (1993) )). Additionally, if we interpreted § 1106(a)(1) to prohibit every transaction for services to a plan, we would have to ignore other parts of the statute. For instance, ERISA specifically acknowledges that certain services are necessary to administer plans.
 
 See
 

 29 U.S.C. § 1104
 
 (a)(1)(A)(ii). Interpreting § 1106(a)(1) to prohibit necessary services would be absurd, and when one interpretation of a statute leads to an absurd result, we may consider an alternative interpretation that avoids the absurdity.
 
 Thorpe v. Borough of Jim Thorpe
 
 ,
 
 770 F.3d 255
 
 , 263 (3d Cir. 2014) (quoting
 
 First Merchants Acceptance Corp. v. J.C. Bradford & Co
 
 .,
 
 198 F.3d 394
 
 , 402 (3d Cir. 1999) ). Therefore we decline to interpret § 1106(a)(1) as prohibiting per se the "furnishing of goods [or] services,"
 
 29 U.S.C. § 1106
 
 (a)(1)(C), by all "person[s] providing services to [the] plan,"
 

 id.
 

 § 1002(14)(B).
 
 [12]
 

 The Supreme Court similarly avoided absurdity in its interpretation of § 1106(a)(1) in
 
 Lockheed Corp.
 
 (addressing whether the administrator of a plan could condition payment on performance by participants). The Court held that payments of benefits to a participant, which under a hyper-literal reading of the statute could be understood as "a transfer to, or use by or for the benefit of a party in interest, of any assets of the plan,"
 
 29 U.S.C. § 1106
 
 (a)(1)(D), was not a prohibited transaction.
 
 Lockheed Corp.
 
 , 517 U.S. at 892-93,
 
 116 S.Ct. 1783
 
 . The Supreme Court rejected the hyper-literal reading because it would have been absurd and illogical in the context of the statute.
 

 Id.
 

 The Court went through the subsections of § 1106(a)(1), listing the different statutorily prohibited transactions, and explained that they follow a common thread: they are all "commercial bargains that present a special risk of plan underfunding because they are struck with plan insiders, presumably not at arm's length."
 
 Id.
 
 at 893,
 
 116 S.Ct. 1783
 
 . The Court distinguished payment of plan benefits because they "cannot reasonably be said to share that characteristic."
 

 Id.
 

 We have interpreted § 1106(a)(1)(D) similarly, holding that a violation occurs when: (1) a fiduciary, (2) causes a plan to engage in a transaction, (3) that uses plan assets, (4) for the benefit of a party in interest, and (5) "the fiduciary 'knows or should know' that elements three and four are satisfied."
 
 Reich v. Compton
 
 ,
 
 57 F.3d 270
 
 , 278 (3d Cir. 1995). In
 
 Reich
 
 , we held that specific intent is required because of the plain meaning of the statutory phrase "for the benefit," and also because if § 1106(a)(1)(D) did not require "subjective intent to benefit a party in interest, [it] would produce unreasonable
 consequences that we feel confident Congress could not have wanted."
 

 Id.
 

 at 279
 
 .
 

 The Supreme Court's identification of the common thread in § 1106(a)(1), a special risk to the plan from a transaction presumably not at arm's length-and its determination that transactions that do not share that common thread are permissible-as well as our interpretation of § 1106(a)(1)(D), represent a more harmonious way to interpret the prohibited transactions listed in § 1106(a)(1) in the context of the statute as a whole. The element of intent to benefit a party in interest effects the purpose of § 1106(a)(1), which is to rout out transactions that benefit such parties at the expense of participants. Section 1106(a)(1) is not meant to impede necessary service transactions, but rather transactions that present legitimate risks to participants and beneficiaries such as "securities purchases or sales by a plan to manipulate the price of the security to the advantage of a party-in-interest."
 
 Leigh v. Engle
 
 ,
 
 727 F.2d 113
 
 , 127 (7th Cir. 1984) (quoting H.R. Conf. Rep. No. 1280, 93rd Cong., 2d Sess. 308) (alteration omitted). We therefore hold that absent factual allegations that support an element of intent to benefit a party in interest, a plaintiff does not plausibly allege that a "transaction that constitutes a direct or indirect ... furnishing of goods, services, or facilities between the plan and a party in interest" prohibited by § 1106(a)(1)(C) has occurred. Requiring plaintiffs to allege facts supporting this element avoids absurdity in interpreting the statute.
 

 2.
 
 Conclusory and well-pleaded factual allegations of
 

 prohibited transactions
 

 The factual allegations that Sweda included in her complaint to support her claims for prohibited transactions overlap with the allegations supporting her fiduciary breach claims. Besides the allegations recounted above, Sweda alleged that revenue sharing was "kicked back" to TIAA-CREF for recordkeeping associated with TIAA-CREF options. Am. Compl. ¶109. She alleged that Penn "allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement." Am. Compl. ¶87. She also alleged that Penn failed to act in the exclusive interest of participants, instead "serv[ing] TIAA-CREF's and Vanguard's financial interests" with decisions such as "allowing TIAA-CREF and Vanguard to put their proprietary investments in the Plan without scrutinizing those providers' financial interest." Am. Compl. ¶¶112, 200. These general allegations about kickbacks and prioritizing TIAA-CREF and Vanguard's financial interests over the participant and beneficiaries' financial interests are largely conclusory, but we also consider well-pleaded factual allegations summarized at § III.B.3 that are relevant to Sweda's prohibited transaction claims.
 

 3.
 
 Sweda failed to plausibly state a claim under Counts II, IV, and VI
 

 Looking at the totality of the allegations in the complaint, taken as true,
 
 Connelly
 
 ,
 
 809 F.3d at 787
 
 , Sweda failed to state a plausible claim for prohibited transactions in Counts II, IV, and VI.
 

 a. Count II
 

 In Count II, Sweda alleged that a prohibited transaction occurred when Penn allowed TIAA-CREF to require inclusion of CREF Stock and Money Market accounts among the Plan's investment options and agreed to TIAA-CREF recordkeeping services, pursuant to a "lock-in" agreement. Am. Compl. ¶193. Two of Sweda's prohibited transaction claims emanate
 from this agreement: (1) that a prohibited transaction occurred at the time of the initial agreement, and (2) that a prohibited transaction occurred every time fees were later paid pursuant to the agreement. As to the initial agreement, Sweda did not sufficiently allege that TIAA-CREF was a party in interest at that time: she included no allegation that TIAA-CREF was "providing services to [the] plan,"
 
 29 U.S.C. § 1002
 
 (14)(B). Because Sweda failed to allege that TIAA-CREF was a party in interest at the time of the "lock-in," that element is factually unsupported, and she failed to state a claim for the first alleged prohibited transaction in Count II. Sweda's second claim in Count II that prohibited transactions occurred every time property was exchanged or services were rendered pursuant to the "lock-in" agreement is so closely related to Count IV (payment of recordkeeping fees) that we will address these claims together.
 

 b. Counts II and IV
 

 In Counts II and IV, Sweda alleged that Penn caused the Plan to enter prohibited transactions when it caused the Plan to pay administrative fees to TIAA-CREF and Vanguard. Sweda plausibly alleged that TIAA-CREF and Vanguard were parties in interest under § 1002(14)(B) because they provided services to the plan at the time fees were paid, and Penn's own Plan materials identify TIAA-CREF and Vanguard as parties in interest. At the pleadings stage, we must assume that this well-pleaded fact is true. Next we look to whether Penn caused the Plan to enter a prohibited transaction with TIAA-CREF or Vanguard for administrative fees. Sweda alleged that the administrative fee payments constituted prohibited transactions under § 1106(a)(1) in three ways: (1) they were prohibited transfers of property under § 1106(a)(1)(A), (2) they were transfers of assets under subsection (D), and (3) they constituted furnishing of services under subsection (C). We first address whether Sweda plausibly alleged that administrative fee payment by revenue sharing constituted a transfer of property under (A) or Plan assets under (D).
 

 Sweda alleged that administrative fees were paid by revenue sharing. Am. Compl. ¶¶ 46, 110 (Vanguard is "compensated for recordkeeping services based on internal revenue sharing it receives from the Vanguard Investor share class mutual funds."). She also alleged that investment fees were drawn from mutual fund assets. Am. Compl. ¶44. ("Mutual fund fees are usually expressed as a percentage of assets under management ... [t]he fees deducted from a mutual fund's assets ..."). Mutual fund assets are distinct from Plan assets, because, under the statute, assets of "a plan which invests in any security issued by an investment company" do not "include any assets of such investment company."
 
 29 U.S.C. § 1101
 
 (b)(1).
 
 See
 

 Hecker
 
 ,
 
 556 F.3d at 584
 
 (With support from the Department of Labor, defendants demonstrated that revenue sharing fees did not impinge plan assets because they were drawn from the assets of mutual funds). Therefore, Sweda did not plausibly allege that revenue sharing involved a transfer of Plan property or assets under § 1106(a)(1)(A) or (D), and furthermore, Sweda did not plausibly allege that Penn had subjective intent to benefit a TIAA-CREF or Vanguard by a use or transfer of Plan assets, which, under our precedent, is required to state a claim under § 1106(a)(1)(D).
 
 Reich
 
 ,
 
 57 F.3d at 279
 
 .
 

 Finally, we must address whether a prohibited transaction occurred under § 1106(a)(1)(C), the prohibition of "furnishing of goods, services, or facilities between the plan and a party in interest." As we explained above, it is possible to read subsection
 (C) to create a per se prohibited transaction rule forbidding service arrangements between a plan and a party rendering services to the plan. However, because reading § 1106(a)(1)(C) to that end would be absurd, Sweda must plead an element of intent to benefit the party in interest. After striking conclusory allegations, such as "Defendants served TIAA-CREF's and Vanguard's financial interests" (Am. Compl. ¶112) from the complaint, we do not find that Sweda alleged facts showing that Penn intended to benefit TIAA-CREF or Vanguard. We will affirm the dismissal of Sweda's claims for prohibited transactions under Counts II and IV.
 

 c. Count VI
 

 At Count VI, Sweda alleged that Penn caused the Plan to engage in prohibited transactions when it caused the Plan to pay investment fees to TIAA-CREF and Vanguard. For similar reasons that Sweda did not plausibly allege prohibited transactions in Counts II and IV, she also failed to plausibly allege prohibited transactions in Count VI. First, Sweda did not plausibly allege that payment of investment fees constituted a prohibited transaction under § 1106(a)(1)(A), because Sweda alleged that investment fees were drawn from mutual fund assets, not Plan assets. Second, for the same reason, investment fees were not plausibly alleged to be a transfer of assets of the Plan under § 1106(a)(1)(D). Third, Sweda did not allege that Penn intended to benefit TIAA-CREF or Vanguard under § 1106(a)(1)(D), as required by our precedent.
 
 Reich
 
 ,
 
 57 F.3d at 279
 
 . Finally, as we explained above in our discussion of Counts II and IV, in order to state a claim for prohibited transactions under § 1106(a)(1)(C), "furnishing goods, services, or facilities between the plan and a party in interest," a plaintiff must allege intent to benefit a party in interest. Sweda failed to do so. Therefore, we will affirm the dismissal of the claim for prohibited transactions under Count VI.
 

 IV.
 

 Sweda plausibly alleged that Penn failed to conform to the high standard required of plan fiduciaries under
 
 29 U.S.C. § 1104
 
 (a)(1). However, she did not plausibly allege that Penn caused the Plan to enter prohibited transactions under § 1106(a)(1). We therefore will REVERSE the portion of the District Court's order granting the Appellees' motion to dismiss Counts III and V and remand for further proceedings. We will AFFIRM the District Court's order dismissing Counts I, II, IV, VI, and VII.
 

 Sweda does not address the District Court's dismissal of Count VII in her opening brief. Therefore, the District Court's dismissal of Count VII is not before us on appeal.
 
 Barna v. Bd. of Sch. Dir. of the Panther Valley Sch. Dist.
 
 ,
 
 877 F.3d 136
 
 , 145 (3d Cir. 2017).
 

 We have also described this as a two-step analysis, but the task is the same.
 
 See
 

 Fowler v. UPMC Shadyside
 
 ,
 
 578 F.3d 203
 
 , 210-11 (3d Cir. 2009) (the court (1) separates factual and legal elements of a claim and takes the well-pleaded factual allegations as true, and (2) determines whether those facts state a plausible claim for relief).
 

 The duties in § 1104(a) fully apply to all fiduciaries except fiduciaries of Employee Stock Ownership Plans (ESOPs).
 
 Fifth Third Bancorp
 
 ,
 
 134 S.Ct. at 2467
 
 . Neither ESOPs nor the fiduciary duties accompanying them are at issue in this case.
 

 ESOP fiduciaries are exempted from the general duty to diversify.
 
 Fifth Third Bancorp
 
 ,
 
 134 S.Ct. at 2467
 
 .
 

 Under ERISA Procedure 76-1 § 10, only the parties described in a request for a DOL advisory opinion may rely on the opinion, and only to the extent that the problem is fully and accurately described in the request. Advisory Op. Procedure,
 
 41 Fed. Reg. 36281
 
 -02 (August 27, 1976). The opinions do not have precedential effect. "Because of the nature and limitations of these rulings," the Supreme Court declined to "express [a] view as to whether they are or are not entitled to deference" in
 
 Comm'r v. Keystone Consol. Indus., Inc.
 
 ,
 
 508 U.S. 152
 
 , 162 n.3,
 
 113 S.Ct. 2006
 
 ,
 
 124 L.Ed.2d 71
 
 (1993). Such advisory opinions are likely "entitled to respect" to the extent that they have the "power to persuade" under the Supreme Court's decision in
 
 Skidmore v. Swift & Co.
 
 ,
 
 323 U.S. 134
 
 , 140,
 
 65 S.Ct. 161
 
 ,
 
 89 L.Ed. 124
 
 (1944).
 
 Christensen v. Harris Cty.
 
 ,
 
 529 U.S. 576
 
 , 587,
 
 120 S.Ct. 1655
 
 ,
 
 146 L.Ed.2d 621
 
 (2000) (citations omitted).
 
 See e.g.
 

 Caremark, Inc. v. Goetz
 
 ,
 
 480 F.3d 779
 
 , 790 (6th Cir. 2007) (deference to DOL advisory opinion was warranted because of the opinion's persuasive force and its consistency with federal and state law and regulations).
 

 Most of the investment options Sweda criticized in her complaint were designated as Tier 3 and Tier 4 options. Sweda also criticized Tier 2 options such as the TIAA-CREF International Equity Index Fund, listed in Sweda's table comparing Plan options with their "lower-cost, but otherwise identical" alternatives. Sweda confirmed that criticized options fell under Tiers 2, 3, and 4 at oral argument. Oral Arg. at 7:33. At this time we do not address whether Penn may be able to assert a defense to liability under
 
 29 U.S.C. § 1104
 
 (c) due to participants' self-directed investing activity. The § 1104(c) safe harbor defense is an affirmative defense and therefore it is generally not part of a court's consideration of a motion to dismiss under Rule 12(b)(6), except where the defense has been anticipated by a plaintiff's complaint.
 
 Hecker
 
 ,
 
 556 F.3d at
 
 588 (citing
 
 In re Unisys
 
 ,
 
 74 F.3d at
 
 446 for the classification of § 1104(c) as an affirmative defense). Unlike the plaintiffs in
 
 Hecker
 
 who explicitly and "thoroughly anticipated" the safe harbor defense, Sweda did not "put it in play" at the pleadings stage.
 

 Id.
 

 Sweda also directly compared fees on options included in the Plan with readily available lower-cost options. The dissent suggests that because the range of fees on options included in the Plan is lower than the range of challenged fees in
 
 Renfro
 
 , Sweda needed to allege a change in market circumstances since
 
 Renfro
 
 was decided to state a plausible claim. In making that suggestion, the dissent misses the object of our inquiry, that is, Penn's "conduct in arriving at an investment decision."
 
 In re Unisys
 
 ,
 
 74 F.3d at 434
 
 (citations omitted). To that end, the allegations in Sweda's complaint show that Penn frequently selected higher cost investments when identical lower-cost investments were available. This is one of many allegations that, together, plausibly allege that Penn breached its fiduciary duty.
 

 As well as the American Association of State Colleges and Universities (AASCU), Association of American Universities (AAU), Association of Community College Trustees (ACCT), Association of Public and Land Grant Universities (APLU), College and University Professional Association for Human Resources (CUPA-HR), Council of Independent Colleges (CIC), National Association of Independent Colleges and Universities (NAICU), and the American Benefits Council.
 

 The dissent also expresses concern that reversal will overexpose university sponsors and volunteer fiduciaries to class action claims designed to yield large settlements and significant attorneys' fees. The dissent fears that universities will be less likely to offer benefit plans and fiduciaries less likely to volunteer their services. If that is the case, we should leave it to Congress to address the possibility of a different fiduciary standard that is suitable to the goal of inducing universities to offer plans and would-be fiduciaries to volunteer. As it stands, ERISA fiduciaries are held to one standard under § 1104 and we cannot adjust our pleadings standards to accommodate subcategories of sponsors and fiduciaries.
 

 The dissent argues that we ought to affirm the District Court's dismissal of Count V for Sweda's want of constitutional standing under
 
 Edmonson v. Lincoln Nat'l Life Ins. Co.
 
 ,
 
 725 F.3d 406
 
 (3d Cir. 2013). The dissent argues that because Sweda conceded that most of the underperforming options are in Tiers 3 and 4, the plaintiffs should have included information about whether they invested in Tier 3 or Tier 4 options in the complaint. In the dissent's view, plaintiffs' failure to include that information constitutes a failure to allege an injury in fact. However, while the complaint does not identify plaintiffs' investment options by tier, it does contain facts that indicate that the named plaintiffs invested in the underperforming investment options. In a paragraph entitled "Standing" in the complaint, Sweda included the following information:
 

 To the extent the Plaintiffs must also show an individual injury ... each Plaintiff has suffered such an injury, in at least the following ways ... The named Plaintiffs' individual accounts in the Plan were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in underperforming options including the CREF Stock and TIAA Real Estate accounts[.]
 

 App. 36-37. This allegation links the named plaintiffs with the underperforming investment options and is sufficient to show individual injuries.
 

 In light of the dissent's point on constitutional standing, we should address the issue as it pertains to participants and beneficiaries who bring a civil action against fiduciaries under
 
 29 U.S.C. § 1132
 
 (a)(2). The dissent cites this Court's decision in
 
 Perelman v. Perelman
 
 , where we held that participants in a defined benefit plan could not show actual injury for constitutional standing for an § 1132(a)(3) claim by pointing to a "diminution of plan assets" because such participants are entitled to a fixed periodic payment rather than part of the asset pool.
 
 793 F.3d 368
 
 , 374 (3d Cir. 2015). We also noted that "[t]here is no question that representative suits by plan participants or beneficiaries against fiduciaries for breach of fiduciary duty are permitted by, and generally brought under, ERISA § [1132(a)(2) ]."
 

 Id.
 

 at 376 n.6. This case implicates the latter part of our observation in
 
 Perelman
 
 because Sweda brought this suit under § 1132(a)(2) on behalf of the Plan.
 

 No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
 

 (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
 

 (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
 

 except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
 
 29 U.S.C. § 1113
 
 .
 

 Moreover, § 1106(a) was not designed to prevent negotiation between unaffiliated parties.
 
 See
 

 Lockheed Corp. v. Spink
 
 ,
 
 517 U.S. 882
 
 , 893,
 
 116 S.Ct. 1783
 
 ,
 
 135 L.Ed.2d 153
 
 (1996). Thus, if a service provider has no prior relationship with a plan before entering a service agreement, the service provider is not a party in interest at the time of the agreement. As explained herein, it only becomes a party in interest after the initial transaction occurs, and subsequent transactions are not prohibited absent self-dealing or disloyal conduct.